Eduardo CANET, Plaintiff,

v.

GOOCH WARE TRAVELSTEAD, Defendant.

No. CV–89–2610 (DGT).

United States District Court, E.D. New York.

Feb. 21, 1996.

Daniel A. Pollack, Martin I. Kaminsky and W. Hans Kobelt, Pollack & Kaminsky, New York City, for plaintiff.

Jack G. Stern, Wendy Z. Brenner, Duker & Barrett, New York City, for defendant.

### CORRECTED MEMORANDUM AND ORDER

TRAGER, District Judge:

This action presents issues regarding the enforceability, under New York law, of an oral contract of employment that included terms promising bonuses and equity participations in projects undertaken by the employee for his employer, a real estate developer.

The lawsuit was filed in 1989 by Eduardo Canet, a New York resident, against Gooch Ware Travelstead, a Connecticut resident who was Canet's former employer. Jurisdiction was based on diversity of citizenship under 28 U.S.C. § 1332. The complaint sought damages for breach of contract and requested a declaratory judgment prohibiting the defendant from collecting on his promissory note until he paid the plaintiff's 1988 bonus. The defendant asserted a counterclaim for immediate payment of the promissory note. The liability portion of this lawsuit was tried to the court for five days from September 28, 1995 to October 5, 1995.

Although plaintiff worked on assignments in Florida, Kuwait, England and Spain for substantial periods, and while arguments could be made that some of these laws, if different, should be applied, both parties have relied upon New York law throughout these proceedings without objection. Moreover, it is conceded that the original oral employment contract between Travelstead and Canet, whatever its terms, was made in New York, as were most of the subsequent promises detailing terms missing from the original agreement.

For reasons more fully set forth below, Canet is entitled to recover on his claim for his 1988 bonus and to pursue his claim for an accounting with regard to his ten percent

interest in the 712 Fifth Avenue project to determine if he received the full amount he was promised. Although a limited partnership was not formed by Travelstead's oral grants to Canet of percentage participations in his projects, Canet's claims with regard to the Barcelona project may be enforced as a joint venture between Canet and Travelstead. In addition, Canet's claims with regard to that project as well as the others may be enforced as "a payout of a profit interest," as promised by Travelstead, Tr. at 337, or, alternatively, as a term of the original employment contract that included incentive compensation in the form of equity participation. Travelstead is entitled to collect on his mortgage on the Canets' Remsenberg house.

## I. Findings of Fact

Plaintiff, Eduardo Canet (Canet), an MBA graduate of Columbia University, first met the Defendant, Gooch Ware Travelstead (Travelstead), sometime about 1978–79 when they worked together on a development project for Grupo Alfa, a Mexican company. The project involved the building of new corporate headquarters for Grupo Alfa in Monterrey, Mexico. Canet was then employed by Grupo Alfa, and Travelstead was a consultant to First Boston.[1] Canet at 207–09. Canet had worked for First Boston prior to joining Grupo Alfa. Canet at 212.

### A. Travelstead's Offer of Employment to Canet

In November 1981, Travelstead invited Canet to leave Grupo Alfa to work for him. At a dinner at the Piccolo Mondo restaurant in Manhattan, attended by their wives, Edythe Travelstead and Sherrill Canet, Travelstead asked Canet to join him in order to "help him in financing, so forth, so he could spend more time looking for new projects." Canet at 211–12. At the time of the dinner, Travelstead was working for First Boston in an unusual role, chairing First Boston's real estate group although he was not a First Boston staff member. The relationship also included an arrangement whereby First Boston became Travelstead's "partner in various real estate ventures, with the right of first refusal." E. Travelstead at 59. *See also,* M. Travelstead at 486. While a number of First Boston staff members worked under Travelstead's supervision, Travelstead's and Canet's discussions contemplated that Canet would work directly for Travelstead. Canet accepted Travelstead's offer; Travelstead then ordered champagne, and the two couples toasted their new relationship. E. Travelstead at 61, Canet at 212.

Canet worked with Travelstead from 1982 to 1989, serving as "his right-hand man, his assistant, his number one chief executive." E. Travelstead at 64–65. Bruce Colley, who was the son (and business associate) of Eugene Colley, a frequent financial backer of Travelstead, and who also worked for Travelstead for several years, described the relationship: "Ware was the concept genius and Eduardo was the man that got the task done, got the project done." Bruce Colley at 528. Frank Dunlevy, who as a vice president of First Boston knew both Canet and Travelstead, recalled Travelstead saying: "[t]hat he considered Eduardo his partner in all of those ventures; they operated like a partnership; shared all of the duties." Dunlevy at 171. Malcolm Travelstead, the defendant's brother, testified that, during the early 1980's, Canet was the only person involved in deal-making who was working directly for Travelstead—as distinguished from First Boston staff. M. Travelstead at 511.

Over time, the Canets and the Travelsteads became very close friends; the line between business and social occasions was often blurred. Referring to the Piccolo Mondo dinner at which Canet accepted Travelstead's offer of employment, Edythe Travelstead testified: "We were all out to dinner, and, which was our custom, because the days were filled with negotiations and so forth, and Ware and I both would spend the evening with clients or potential clients or recruiting people ..." E. Travelstead at 59. Dunlevy also testified as to the closeness of the relationship (at 173):

---

1. Travelstead listed the Grupo Alfa project among his accomplishments in a brochure for the project in Barcelona, Spain. Def.Ex. 37 at 4.

You know, they worked about as close together as you possibly can, and they worked on a lot of exciting projects and they socialized together. Their wives were close friends, close friends with his brother Malcolm. You know, everybody sent birthday and Christmas presents to each other's kids. It was, you know, as close a knit group as you could ever see.

## B. The Terms of Canet's Employment Contract with Travelstead

The content and enforceability of the employment contract formed at the Piccolo Mondo dinner is the crux of the litigation. Canet testified that Travelstead offered him: "[A] salary of $100,000. He also promised me a bonus every year, and he also promised me a piece of his interest in the ongoing—on the projects that we were going to be developing. That was the lure, to be able to get a piece of the projects." Canet at 211. Edythe Travelstead's testimony was substantially the same as Canet's, but she added: "[Travelstead] offered [Canet] a bonus that would become a multiple of [the $100,000 salary], because the expectations were that enormous sums of money would come into the group. At the same time, he offered him a percentage of the projects that he would work on." E. Travelstead at 60. Sherrill Canet also testified concerning the employment offer accepted by her husband at the Piccolo Mondo dinner in November 1981: "[Travelstead] asked Eduardo if he would like to be his right-hand man and work for him, and he offered him a salary of $100,000, and a guaranteed cash bonus at the end of every year, and equity participation in the projects he worked on." S. Canet at 96.

Travelstead professed only a vague recollection of the dinner and denied offering Canet equity participation as a term of employment. Travelstead at 336, 341–42. Travelstead stated he had told Canet that, although "the bonus is totally up to me, discretionary, but you should certainly anticipate a bonus if you are doing a good job, otherwise you won't have a job in that sense, so." Travelstead at 336–37.

Canet stated that the equity participation "was the lure, to be able to get a piece of the projects." *Id.* The importance of the offer of equity participation to Canet was supported by the testimony of Frank Dunlevy, who described conversations with Canet (at 181):

> ... I would say, it was much safer having a job at First Boston because it was a bigger, more established entity and that [Canet] was taking a higher risk. And he would say, you know, higher risk gets higher return and that there were, you know, significant tax advantages, as I think all of us are aware, to real estate and real estate partnerships, certainly prior to the change in the tax law.

Canet's wife also noted: "[I]nstead of going to work for an investment bank, as he had done before, the equity participation was certainly a big attraction to the terms of the employment." S. Canet at 97. As noted by the defendant, Canet has pursued a successful career in investment banking following the termination of his employment with Travelstead. Def. Post–Trial Resp.Brf. at 16.

Travelstead stated that "equity participation in real estate projects" could take a number of forms: "[It] can be a payout of a profit interest, or it can be a full partnership as a general partner, or owning a piece of a corporation that is doing a real estate development. It could be a limited partner." Travelstead at 337. Canet's testimony as to the nature of the interests he was granted, although essentially consistent with the categories stated by Travelstead, used a variety of terms to describe them: "a carried interest, and also, you know, I would have been on the hook for some notes, non-recourse notes [in Southshore]," Canet at 215; "a piece of Ware's partnership into the overall partnership, into the overall vehicle [in Silas Creek]," Canet at 223; "Ware g[a]ve me a piece—gave me half of 1 percent of his interest in Tower 49," Canet at 229; "7½ percent of his share [in Canary Wharf]," Canet at 234; " 'we will split this partnership [referring to Barcelona] [60/40]," Canet at 246; "[i]f we buy the company, you're getting 10 percent of my interest or 10 percent of my profits [in McCormick]," Canet at 261; "percentage interest in Mr. Travelstead's interest

[in 383 Madison and generally]," Canet at 280, similar at 294–95 [South Shore], 301 [712 Fifth Avenue].

The court accepts the accounts of Travelstead's offer of employment to Canet that were provided by Canet, his wife, Sherrill Canet, and Travelstead's ex-wife, Edythe Travelstead. On this critical issue, the court did not find Travelstead to be a credible witness. On the other hand, Canet struck the court as a credible witness not prone to exaggeration as his account of his negotiations with Travelstead shows. Although Sherrill Canet's testimony might be discounted somewhat for partiality or interest, and that of Edythe Travelstead for bias resulting from her bitter divorce from Travelstead, their accounts, as well as Canet's, were not only substantially consistent but were corroborated in important details by Travelstead's brother, Malcolm Travelstead, and, often, in its credible parts, by Travelstead's own testimony, as well as by Canet's witnesses, David Solomon, Frank Dunlevy, Eugene Colley and Bruce Colley.

Among the critical factors prompting the court's assessment of the parties' credibility was the testimony of the defendant's brother, Malcolm Travelstead, a defense witness, whose account, while not directly contradicting his brother, described conversations with the plaintiff over a long period of time that make sense only if Canet's account of his employment relationship was substantially accurate. M. Travelstead at 490, 507, 512–13, 515–17. Indeed, if Travelstead's denial had any substance, then Canet's actions, conduct and statements over a period of years would be completely inexplicable. Moreover, were his claims false, it would mean that Canet had been making dishonest statements to family, friends and business associates over an extended period of time. See, S. Canet at 97; Dunlevy at 181; Solomon at 422–23, 426; M. Travelstead at 488–89. This would have been in complete contradiction to his business reputation and the respect in which he appears to have been held by those who dealt with him in business and government. E. Travelstead at 64–66; Dunlevy at 178–79; E. Colley at 190; Travelstead at 338, 344, 359; M. Travelstead at 515–16. In addi-

tion, Canet's remaining in Travelstead's employment makes little sense if his account were not true.

As for the point stressed by defense counsel at trial, Tr. at 22–29, namely, Canet's failure to directly confront Travelstead about the latter's failure to carry out his commitments, the matter is easily explainable. First, Canet was no doubt reluctant to risk destroying a long-standing relationship with much economic potential. Second, and equally significant, as Travelstead's brother candidly testified, his brother was not a person to confront directly. Referring to conversations with Canet in the months before Canet resigned, Malcolm Travelstead testified: "And I even think I said that be prepared to draw a line in the sand that you may have to take alternative actions.... Meaning you better have a job because I don't know what my brother's reaction is going to be. He's not a person that likes to be confronted." M. Travelstead at 489.

Equally significant, Canet's account is consistent with, and thus corroborated by, Travelstead's manner of dealing with other business associates. Travelstead's acknowledged use of "sweat equity" participations in 712 Fifth Avenue and Canary Wharf were in the form of payouts of profit interests. The proposed grant of equity interests in the Barcelona project to Rovet and Malcolm Travelstead were in the form of a limited partnership based on "sweat equity." Rovet at 444–45. Bruce Colley described an oral sweat equity arrangement he obtained while he was employed by Travelstead. B. Colley at 525–27.

The court finds that Travelstead offered Canet an initial salary of $100,000, a substantial annual bonus and "a piece of his interest in the ongoing—on the projects that we were going to be developing." Canet at 211. The court finds that Travelstead's offer of "a piece of his interest in ... the projects" was an offer of equity participation that could take any of the forms he had outlined, payout of a profit interest, full partnership as a general partner (in a joint venture), owning a piece of a corporation, or limited partnership. It is evident from both men's testimony that whatever arrangement that would ultimately

be employed would depend on the nature of the project, tax, financing and other similar considerations so as to arrive at the most mutually advantageous arrangement.

### C. Projects for Which Canet Claims Interests Were Promised to Him

#### 1. South Shore–Miami Beach, Florida

Canet began working for Travelstead in January 1982. The first project he worked on was the South Shore development in Miami Beach, Florida. He "worked with Ware in the zoning matters, with the local authorities, of trying to get the project approved." Canet at 212–13. Travelstead promised him "a 5 percent interest in his interest in that project." The offer was made at a lunch at the Grove Isle Hotel in Coconut Grove, Florida, with both Mrs. Canet and Mrs. Travelstead present. S. Canet at 143; E. Travelstead at 62–63. Canet testified that the promise was made in February 1982. Canet at 294. Travelstead conceded that: "Eduardo was very instrumental in dealing with the Council of the City of Miami Beach ..." Travelstead at 344. As a result of delays in obtaining approvals, Travelstead ultimately negotiated for "rights in a parcel of land in the redevelopment area" as a means of getting his investment back. Canet at 213–14.

#### 2. Silas Creek–Winston–Salem, North Carolina

The next project Canet worked on was Silas Creek, a project to develop a mixed use complex on undeveloped land in Winston–Salem, North Carolina. Canet testified that he played a financial role in the project: "I worked on all the financial information, put the pro formas together. I worked on preparing an information memorandum to attract a partner, financial partner to come in. I met with the financial partner.... Worked also on the development aspects of the project." In Travelstead's office in New York, Travelstead offered Canet a two and one-half percent share in the project in 1983. Canet at 218–19, 296; S. Canet at 144; E. Travelstead at 62–63. Travelstead acknowledged Canet's work on the financial side of the project. Travelstead at 348. Edythe Travelstead testified that the Silas Creek

development work was not finished prior to its sale. E. Travelstead at 85.

#### 3. 383 Madison Avenue

In 1983–84, Canet worked on the acquisition of 383 Madison Avenue, between 46th and 47th Streets in Manhattan. Canet was heavily involved in the acquisition of Grand Central Station air rights from Penn Central and in obtaining financial backing for the project. Canet at 219–23. Canet spent a month in Kuwait meeting with Abdul–Wahab Al–Babtain, who several times invested in Travelstead projects. Pltf.Ex. 39–40. Apparently during this visit Canet and Malcolm Travelstead first worked together. M. Travelstead at 487, 499, Canet at 219–20.

Travelstead denied that Canet's 1983 trip to Kuwait had anything to do with 383 Madison because, he said, Al–Babtain lived in Saudi Arabia. Travelstead at 457. Plaintiff produced, however, a letter dated October 3, 1983 to Al–Babtain in which Travelstead proposes that the Al–Babtain family invest in 383 Madison. The letter concludes: "We look forward to seeing you and your brothers in Kuwait ..." Pltf.Ex. 39.

Travelstead, in December 1983, in response to Canet's request for the papers consummating the transfer of the interests he had been promised in South Shore and Silas Creek, proposed rolling those interests into a two percent interest in 383 Madison. Canet accepted. He described the proposed interest as "a piece of Ware's partnership into the overall partnership, into the overall vehicle." Canet at 219–23; S. Canet at 99–100; E. Travelstead at 63–64; Solomon at 423, 426. Sherrill Canet testified that at a Christmas party in the Travelsteads' Park Avenue apartment in 1983, Travelstead stated that he would give Canet two percent of 383 Madison and Canet would "forfeit the South Shore and Silas Creek" participations. S. Canet at 147. Canet also testified that Travelstead confirmed the interest in 383 Madison at a "Christmas get-together at his house ... in Greenwich, Connecticut." Canet at 231–232.

Travelstead testified that: "383 still hasn't been developed to this day...." Travel-

stead at 353. He also testified that he had given Frederick Rovet a bonus in 1988 because of his work on litigation related to 383 air rights that had gone to the Supreme Court. *Id.* at 457–58.

### 4. 712 Fifth Avenue

Canet was also heavily involved in Travelstead's assemblage project undertaken at 712 Fifth Avenue, on the site of the Harry Winston Jewelers and the Rizzoli Building. Canet traveled to Italy with: "[real estate developer] David Solomon once a month for almost a year, a year and a half, to see the owners of two of those properties that we were trying to purchase." Travelstead granted Canet a ten percent share at the outset of the project, in Travelstead offices on Third Avenue, in September 1983. Canet at 224–27, 303. Travelstead conceded that he had offered "ten percent of whatever profits I made out of it I was going to give to him," because of Canet's "[v]ery outstanding good job of dealing with the City and dealing—I was over with Canary Wharf at the time, he was in New York dealing with the City day and night and managing that, and he was doing a great job." Travelstead at 338.

Travelstead sold his interest to David Solomon in the 712 Fifth Avenue project prior to construction for $16 million. Canet at 225–26. (Solomon stated "in excess of ten million," at 425.) Canet asserted that Travelstead's profits were $5 million. Travelstead paid Canet $310,000 in 1986, not the $500,000 to which Canet claims he was entitled. Canet stated that when he raised the question of the remaining $190,000, Travelstead told him: "'There is a Cuomo tax issue. As soon as David Solomon's letter of credit clears, I will pay.'" Canet at 227–28. Interestingly, the way that Travelstead describes the receipts appears to confirm Canet's assertion that $10 million was a net figure: "We got all our expenses back, and in essence made $10 million on top of all of the monies, cash outlay, and First Boston and I split that.[2]" Travelstead at 354–55. The "Cuomo tax," a ten percent tax on the profit realized by real estate transfers of $1 million or more, appears, from Travelstead's testimony, to be the only deduction remaining once Travelstead received the $5 million. *See* N.Y.Tax L. §§ 1440 et seq. (McKinney 1987 & Supp. 1993). This is an issue that will have to be resolved during the damages phase.

### 5. Tower 49

At Christmastime 1984, Travelstead gave Canet a one-half percent interest in Tower 49. Canet acknowledged that he had done little on Tower 49 but that Travelstead explicitly stated that the interest was "in recognition of the work [Canet] had done as well in these other projects." Canet at 229–30. David Solomon, Travelstead's partner in Tower 49, confirmed that Travelstead had stated that Canet owned a one-half percent interest in Tower 49. Solomon at 422.

### 6. Canary Wharf

In 1985, Canet began working on the Canary Wharf project in London, a major development project undertaken with First Boston/Credit Suisse. He ultimately moved to London for "a year and a half, two years." Canet at 231. Canet dealt with the London Docklands Development Council "negotiating what's called the Master Building Agreement," dealing with zoning, landmark, and project commitments to provide jobs, schools, etcetera. Canet at 232. Travelstead also spent substantial time on the project, commuting to London from New York. Travelstead at 359–60. Travelstead admitted that Canet "did a great job, and certainly something I couldn't have done as well as he did.... Mr. Canet was certainly the main negotiator on the Docklands Development contract, the development plan. He was certainly the main one on that, and he was the main negotiator with Tower Hamlets, but I was the main negotiator with the government in England ..." Travelstead at 359.

At a Thanksgiving dinner in London in 1986, at the home of Sandy Csobaji, another project participant, it is undisputed that Travelstead told Canet and some others that

---

**2.** N.Y.Tax L. § 1441 provides for a ten percent tax on the gain from the transfer of real property.

§ 1443 exempts transfers for which "the consideration is less than one million dollars."

he was going to divide 25% of his share of the project among several of the key people there. Travelstead at 361. Canet initially stated that Travelstead committed seven and one-half percent or one-quarter of his one-quarter share [e.g., six and one-quarter percent] to him, but upon further questioning by the court with regard to the inconsistency, stated that his share was to be seven and one-half percent. Canet at 234. Edythe Travelstead confirmed Travelstead's commitment of a share of his interest at the dinner but did not recall the quantum. E. Travelstead at 66. Sherrill Canet testified that Travelstead told her and her husband that his share of Canary Wharf would be seven and one-half percent. S. Canet at 101.

Subsequently, when the project was purchased by Olympia and York in July 1987, as part of the sale, Travelstead set aside seventeen percent of his share of a continuing "net profit interest" or "carried interest" for four people. (Following the Thanksgiving, 1986 offer, Travelstead had decided that one of the intended recipients, Scott Lowry, no longer deserved a share.) Canet's share was set at four percent.[3] At the time, the "carried interest" was believed to be of value. Travelstead at 362. Canet describes the value of the carried interest as "minuscule," while $5 million was paid to Travelstead and First Boston on top of costs and expenses at the time of the sale. He got no part of Travelstead's sale of his interest in the project, other than the four percent "carried interest." Canet at 242.

In 1988 or 1989, Travelstead and First Boston restructured their arrangement, effectively ending their partnership. As part of the transfer of Travelstead's "carried interest" to First Boston, Travelstead obtained "a recognition agreement," in which First Boston assumed the responsibility for payment of the seventeen percent of Travel-

stead's five percent "carried interest" to the four designated Canary Wharf principals. Travelstead at 363–64. Travelstead also testified that he negotiated at the end of the project for a payment to himself "just shy of 46 million," of which he set aside $1 million for payments "to some key people, including Mr. Canet and five or six other people." His statement that: "we roughly set aside between 17 and 20 percent of what I was being paid, and that was paid out in bonuses" is difficult to reconcile with his other testimony regarding his profit at the conclusion of the Canary Wharf project that suggests that less than twelve percent of his profit was paid in bonuses.[4] Travelstead at 367–68.

Canet continued to serve the Canary Wharf Development Co. Ltd. during a transition period in 1987 between Travelstead–First Boston to Olympia & York project ownership. Def.Ex. 43. Canet's role in the transition was, in fact, a condition upon the sale to Olympia & York. He testified that he believed he was the only person asked to stay on the project after Travelstead sold his interest. Canet at 304.

## D. Canet's 1986 Letter Listing Unfulfilled Commitments

By the summer of 1986, Canet was completely frustrated that, after working for Travelstead for four and one half years, none of Travelstead's commitments to him had been carried out. Canet finally got up the courage to write a letter to Travelstead listing the latter's commitments with respect to promised equity participations. Pltf.Ex. 7. Canet listed his concerns that the full amount of the 56th Street transaction (712 Fifth Avenue) had not been paid and that he had not gotten "the papers" formalizing the transfer of equity in 383 Madison Avenue, Silas Creek,[5] 712 Fifth Avenue, 222 Broadway,

---

3. Travelstead explained that the seventeen percent of "carried interest" was divided as follows: "two percent to Brian Kohn, four percent to Eduardo Canet, four percent to Robert Franko and seven percent to Sandy Csobaji." Travelstead at 362, 365. The deduction from the amount originally "set-aside" for Lowry is larger than any share actually granted to the other four, and of course, an interest in Travelstead's *share* is different from an interest in his *carried interest*.

4. Travelstead stated that he owed First Boston $37.5 million, so his net profit appears to have been $8.5 million. $1 million is 11.7% of that figure, not the 17% or 20% to which he testified.

5. Canet explained the reference to Silas Creek after it had been "rolled into" 383 Madison at trial: "[H]ere I wanted to point out all of the things that he has granted me equity interest in.

Tower 49, or Canary Wharf. Canet also requested payment of his 1985 bonus. Canet asked Travelstead to fulfill the commitments that he had made. In the letter Canet also stated: "If you [Travelstead] truly believe that what I am asking is in any way different from you have promised [sic], I want to sit down with you to discuss and finally resolve these issues." He also expressed great interest in taking on overall responsibility for Canary Wharf, in response to a suggestion Travelstead had made that he was considering such an assignment.

Canet testified that he gave Travelstead his letter at 47 Park Street, "a hotel in London where we [presumably the Canets and Travelstead, while in London] not only lived, but also had our offices." Travelstead read the letter and the two men went over it. Canet also gave the letter (presumably a copy) to Travelstead's attorney, Mike Masin. Canet at 236–37. Several weeks later, Travelstead gave Canet a check for $150,000 for his 1985 bonus (net of estimated taxes).[6] *Id.* Sherrill Canet confirmed her husband's account, noting that "he was a little uncomfortable giving [the letter] to Ware. He didn't know how Ware would react." After Canet had given Travelstead the letter, Mrs. Canet had a private conversation with Travelstead about it, no doubt of a desire to minimize any adverse reaction it might have provoked. She told Travelstead "that Eduardo was uncomfortable giving him this letter." Travelstead responded that "he [Canet] was right about what was in the letter." S. Canet at 103, 105.

Both Canets testified to their conversation in London in 1986 with Mike Masin, Travelstead's personal attorney, at the restaurant, La Gavroche, in which they raised their concerns that Travelstead had not documented the equity interests he had promised Canet. Canet at 311; S. Canet at 103. Canet testi-

fied that he thought the dinner took place after he gave his letter to Travelstead. Canet at 311.

Canet testified that after he had discussed his letter with Travelstead and Masin, Masin, in a letter dated September 29, 1986, sent Canet a document that granted him a small interest in 222 Broadway plus $600,000 in losses for tax purposes. Canet ultimately declined this interest, which he felt was offered as an accommodation to the concerns expressed in his letter. He believed it was "not what we had agreed to." Canet at 308–09.

Travelstead denied ever receiving Canet's letter. Travelstead at 404. Travelstead's denial that he did not receive Canet's 1986 letter and acknowledge the commitments it contained is simply not credible. Tr. at 555. The 1986 letter lends support to Canet's claim because it itemized his expectations at that time, was provided to and discussed with Travelstead, who, the court finds, not only did not regard Canet's expectations as a figment of his imagination, but set in motion the drafting of an agreement with regard to 222 Broadway and the two aborted payments of Canet's 1985 bonus.[7]

### E. McCormick Spice Company Stock Purchase and Sale

Following the sale of Canary Wharf in July 1987, Canet returned to New York in December 1987. Upon his return to New York, Canet became involved with Travelstead's effort to takeover or otherwise improve the stock price of the McCormick Spice Company. This effort was based on Travelstead's view that the company's real estate holdings (with which he had worked for three years in the late 1960's, Travelstead at 334) were undervalued by the stock market. Travelstead acquired, on margin, about 4.9% of

I forgot, for example, Southshore." Canet at 323.

**6.** The $150,000 check for the 1985 bonus was dishonored. A subsequent payment of the 1985 bonus in 1986 also resulted in a dishonored check. Travelstead at 399. The 1985 bonus was finally paid with interest in 1987. Def.Ex. 41A.

**7.** Travelstead explained the two dishonored bonus checks as having resulted from 'concern with

the differing tax consequences of payment in 1986 rather than 1987, when personal income tax rates were lowered. Travelstead claimed that he and Canet agreed that the second bonus payment was to be treated as a loan, but after his accountants advised him that IRS would not treat it that way, that check also was not permitted to clear. Travelstead at 399.

non-voting McCormick stock. Travelstead described Canet's role in the project, Travelstead at 369–70:

He was the point man on all of the gathering of the information and setting up meetings with the Blackstone Group [a Wall Street investment consulting firm], and I'm sure he had many, many meetings that I wasn't a part of as he was gathering basically Securities and Exchange Law, as we were educating ourselves in Securities and Exchange Law, because I never had been involved in a publicly held stock company. So we were learning what we could and couldn't do, and then looking at setting up an acquisition vehicle, because I didn't have enough money, number one, to go past the 4.9 percent anyway; and, number two, if we were going, we would have to go all the way, and it meant the raising of several hundred million dollars.

Canet testified that he had, Canet at 260:
... worked on that deal, oh, for about four intense months, with the lawyers and the investment bankers.... I worked with the lawyers on the documents and trying to get investors for the equity so we could have sufficient equity so the investment banks can put up the financing. In that regard I was successful to bring Abdul Wahal Al–Babtah and Abdul Wahal was [sic] spent $5 million. I had also spoken to quite a number of investors that were interested to proceed and put the money in if we were finally going to go forward.

That money he raised was never utilized because Travelstead sold his shares at "a substantial profit" to the stock market. Canet testified that Travelstead offered him 10 percent of the project profits: "If we buy the company, you're getting 10 percent of my interest or 10 percent of my profits. If we sell the—if we sell the position or the company buys our position at a premium." Canet at 260–61. Canet stated that Travelstead never paid him.

Ultimately, after Travelstead had discussed his effort to buy the company with its CEO, an old friend of his, the McCormick Corporation acted upon Travelstead's advice and sold its real estate holdings to the Rouse Corporation. Travelstead had initiated the contact with the Rouse Corporation. The sale of the real estate interests netted $500 million and drove the price of the stock up so that Travelstead was then able to sell his holdings to the market at a profit. Travelstead at 370–72. Travelstead testified that his only offer to Canet was the opportunity to participate in an acquisition partnership in proportion to the capital contribution he made. *Id.* at 373. He offered a draft partnership agreement in which capital contributions are required. Def.Ex. 22.

Although the court was initially reluctant to award Canet a share of Travelstead's profits from appreciation of his personal stock holdings, Tr. at 554, 568–69, 592–93, review of Travelstead's own testimony crediting his own efforts as the source of that appreciation has convinced it otherwise. Travelstead testified at length concerning the success of his efforts in causing the appreciation he realized. Travelstead at 370–72. The court does not credit Travelstead's testimony that Canet would have had to invest proportionately in order to receive any equity participation in the project. It is clear that Canet put substantial sweat equity—"four intense months"—into the project and that the project made a significant profit. Canet at 260. Travelstead acknowledged Canet's services to the project, especially with regard to the securities aspects of the project. Travelstead at 370–72. As Canet's terms of employment included equity participation in each project he worked on, the court finds that Canet is entitled to the ten percent share of Travelstead's profits that he was offered.

## F. Barcelona Olympics Project

The last project on which Canet was associated with Travelstead was a development in Barcelona in a slum area that was to become the site of the 1992 Olympic Village. This project had been proposed in 1988 to Travelstead and Canet by Bruce Graham, a senior partner in the architectural firm of Skidmore, Owings and Merrill. Travelstead was reluctant to undertake the project because "I didn't know what I had to offer in Spain. I didn't speak the language, and I didn't want to get into debt over there." Canet, a native

Spanish speaker, was, on other hand, an enthusiastic proponent of the project. Travelstead at 374–76. Edythe Travelstead was also enthusiastic about the project and suggested that Canet should undertake it. E. Travelstead at 68. Canet began work on the project, probably, in March or April 1988.[8]

Canet testified that Travelstead agreed to put up $5 to $10 million in seed money to obtain the land. Canet at 243. Travelstead's role was to be solely that of providing funding and giving the Travelstead name to the endeavor, rather than the active development role he played in other projects. Travelstead at 375. Canet expressed his willingness to undertake recourse debt in connection with this project, Canet at 247, which, along with his role as the primary developer, helps to explain his substantially larger share than he received for his sweat equity in their earlier projects.

For these reasons, Travelstead initially proposed a partnership in which Canet would have 60% and Travelstead 40%. Travelstead testified that his initial reaction was: "I could add nothing to it. I didn't speak Spanish and didn't want to go." Travelstead at 375. Edythe Travelstead testified that Travelstead had said: " 'I make my trade by negotiating and talking. I don't speak Spanish. I cannot function in that environment.' " E. Travelstead at 68. She also testified that Travelstead had told Canet: " 'I'll be in the background, and I'll be your consultant. When you get into trouble, if you need advice or whatever, I'll be there. I'll provide the initial seed money to get it going ... but, I'm looking to you to get the financing, you to put the package together, and it's up to you. You're the developer, not me.' " E. Travelstead at 69.

Canet worked with the architect, Graham, "talking and getting presentations to the city ... working on trying to put the deal together." He obtained an option on land for a "small office building and retail component."

Other aspects of the Olympic Village went to other developers. Canet at 243–44.

Later, Travelstead complained that he was having to put up a lot of money and the two men agreed to change the percentages to 50/50. Later still, shortly before they were to sign agreements [apparently for the purchase of the option on the land from the City of Barcelona] Canet agreed to Travelstead's proposal of a further reduction in Canet's share to 40%. In addition to the reduction in his share, Canet was to pay, from his share, a Barcelona architect who had assisted on the deal. Canet stated that Travelstead told him that he would "advance you 2 million on a note. Exactly a note like First Boston." Canet at 244–47.

Originally the funding for the option on the Barcelona land was to be based on a loan from the Fisher brothers but a dispute arose that resulted in unavailability of funding from that source. Eugene Colley, who had previously funded Travelstead projects, finally put up the money for the option. Canet at 244–45; E. Colley at 186–87. The prospective source of project financing located by Canet, the Chan Group, was unsatisfactory to Travelstead because it insisted on developer status. Travelstead at 380–81. Travelstead sent the Chans a "divorce agreement," dated December 22, 1988. Canet at 269; Travelstead at 380–81; Def.Ex. 28. However, Canet retained the hope for some time that the Chans would provide funding. Travelstead at 382. Edythe Travelstead stated that Travelstead had told her that his dispute with Canet [in May 1989] was based on his view that the deal Canet worked out with the Chans was "totally untenable." E. Travelstead at 71.

After this "divorce" letter was sent to the Chans, the Travelsteads, the Canets and a third couple, the Perellas,[9] vacationed together at the Glitter Bay Hotel in Barbados over Christmas. The Canets and Travelstead tes-

---

8. The inception date of the Barcelona project as March or April 1988 is estimated. Canet said he spent four months on the McCormick project after his return from London in November 1987 and then thirteen months on the Barcelona project prior to the purchase of the option of the land in April 1989. Canet at 243, 260.

9. Although they do not otherwise figure in this litigation, the Perellas were close friends of the Travelsteads and the Canets. E. Travelstead at 61.

tified that the 50/50 split in the project was discussed at dinner there. Travelstead acknowledged discussing a 50/50 split with Sherrill Canet over dinner, stating: "I agreed with her that he had been working very hard, didn't know how the project was going to go ahead, that our so-called financing partner had disappeared, but as hard as they were working and the fact they would have to move over there, maybe it did merit a 50/50 split." Travelstead at 382, 386; Canet at 270–72; S. Canet at 107. Travelstead testified that Canet told him that he was optimistic about reopening the discussions with the Chans. Travelstead at 382.

Travelstead explained the final breakdown of the relationship was based on Canet's failure to obtain financing for the project. Travelstead at 378–79. Travelstead stated that his investment in the project before Canet resigned, including the option on the land, was $9 million, in addition to the $5 million provided by Eugene Colley. Travelstead at 383–84. However, Travelstead's explanation for the breakdown, while perhaps justified in his mind, is not convincing. He, himself, described the problems in obtaining project funding: "In a case like this project, it never got bank financing until it was two years into the project, because you had to create enough value that the banks believed it was going to get done." Travelstead at 380.

The Barcelona project had been underway for less than a year in December 1988 when Travelstead claimed to have become dissatisfied with Canet's efforts to obtain financing for the project. Travelstead at 391. As Canet noted: "We did not have, at that time, the greatest of names. . . . We did not have First Boston as a partner. . . . And there were . . . quite [a] number of very interested parties trying to get these parcels to develop." Canet emphasized the critical nature of the work he did in early 1989 to obtain the option on the land, without which no project was possible. Canet at 242–45. Furthermore, Malcolm Travelstead testified that his work, from the time he returned to work for Travelstead, in February 1989, was focused on obtaining financing for the Barcelona project. M. Travelstead at 493.

During this period, Canet testified that he was pushing Travelstead and Mike Masin for a written agreement. Finally a meeting was held in Travelstead's office, in May 1989. At that meeting, after the option on the land with the city of Barcelona had been signed, Travelstead told Canet that his share would be only 6%, with "an additional 6% over time on that project." Canet stated that this proposal came as a complete shock to him, that it "was the straw that broke the camel's back." Canet at 245–48.

Travelstead stated that, in May 1989, after Canet had been unable to find an equity partner, he proposed to reduce Canet's share of the Barcelona project to 12 percent. He testified that Canet objected, insisting on no less than twenty percent. Travelstead at 386–87. Edythe Travelstead described the confrontation between Travelstead and Canet as having been based on Travelstead's judgment that the deal Canet had worked out to obtain financing from the Chans was "totally untenable." She was not in the meeting, but was nearby, and heard "a great deal of yelling" from a conference room next door to her office. She testified that, following that confrontation, Travelstead reduced Canet's percentage to twenty percent, dispatching Mike Masin to tell Canet. Following that meeting, Canet resigned, but, after further intercession by Mike Masin, Canet returned "to stay and see if they could work it out, and also to provide at least some transition." E. Travelstead at 70–74.

Subsequent to Canet's resignation and after Eugene Colley withdrew his funds, Travelstead invested "another $35 million just to buy the land from the city." Travelstead at 390. Malcolm Travelstead described the efforts of his brother, Canet and himself "trying to find possible investors and/or lenders who would allow the project to go forward." He stated that ultimately funding for the project was obtained from a Japanese company. M. Travelstead at 493. Canet believes Travelstead also received a substantial developer's fee from Sogo, the Japanese investor. Canet at 254.

It is undisputed that Canet and Travelstead agreed that Canet should become the developer on the Barcelona project. Travel-

stead at 377; E. Travelstead at 69; Canet at 244. The division of percentage share in the project between Canet and Travelstead was discussed several times. Both Canet and Travelstead agree that the last division on which they agreed was forty percent for Canet, sixty percent for Travelstead. Canet at 247; Travelstead at 377. Travelstead's testimony that Canet's share would be based on the capital he contributed is not credible. It conflicts with his actual knowledge of Canet's resources, his emphasis on Canet's efforts in his admitted statement to Sherrill Canet in Barbados in December 1988 that Canet's share should be modified to be fifty percent, and with other testimony Travelstead gave. It also conflicts with Travelstead's conduct of the project throughout 1988, with no indication that a capital contribution was expected from Canet. Travelstead had stated that it was arranged that he would play the financial role with respect to Canet that First Boston had played for him, that is, provide him with substantial loans for development. Travelstead at 379.

The evidence is compelling that Travelstead assumed a far greater role and financial commitment to the Barcelona project than he had anticipated and, while he might understandably have expected his share to reflect this greater financial responsibility, he could not unilaterally and radically alter the commitment which Canet had relied upon in undertaking the project.

### G. Canet's Conduct Following His Resignation

Travelstead described Canet's return as based on Canet's desire to reconsider his resignation. Travelstead states that Canet "took all the files from Barcelona and disappeared." Travelstead at 388. Edythe Travelstead stated, however, that Canet returned both to "see if they could work it out, and also to provide at least some transition." She affirmed that he had provided transition for the project. E. Travelstead at 73. Malcolm Travelstead, who continued to work on the Barcelona project after Canet's departure, provided no confirmation of his brother's charge that Canet disrupted the project. M. Travelstead at 488–93. Further, Travel-

stead's allegation that Canet had contacted Eugene Colley to encourage him to withdraw his funds from the project, Travelstead at 388–89, was effectively contradicted by both Eugene and Bruce Colley who described their efforts to contact Canet when Travelstead refused to return their phone calls. Canet merely told them he was no longer associated with the project, and they appear to have drawn their own conclusions as to its prospects. E. Colley at 193–96; B. Colley at 522–25.

Although Travelstead has asserted that Canet engaged in misconduct and disloyalty after he resigned, the court does not credit his testimony except as it may reflect a genuine misunderstanding with respect to the Colley incident. It is possible that that misunderstanding precipitated Travelstead's effort to collect on his loan to the Canets and brought on this litigation.

### H. The 1988 Bonus

At a gathering at Christmastime 1988 at Travelstead's home in Greenwich, Connecticut, Canet, his wife and Edythe Travelstead state that Travelstead promised Canet a $300,000 bonus. E. Travelstead at 74–75; S. Canet at 108–09; Canet at 255–56. Canet testified that Travelstead stated that the bonus was in recognition of his "incredible job in Barcelona." Canet at 255. Travelstead denies ever promising Canet a bonus for 1988. Travelstead at 390–91. Travelstead testified that the only bonus he paid for 1988 was to Fred Rovet, because there had been no income in 1988. Rovet received a bonus "because he had spent day and night ... getting the case [regarding the 383 Madison Avenue air rights situation to] ... to the Supreme Court of the United States." Travelstead at 457–58. Travelstead, however, also testified that he made a substantial profit on the sale of his McCormick stock in 1988. Travelstead at 372.

Travelstead testified that his dissatisfaction with Canet in December 1988 made it inconceivable that he would have promised him a bonus of $300,000 for 1988. Travelstead asserted that he was dissatisfied that Canet had failed to obtain project financing. Travelstead at 390–91. However, he also

testified that "[until] we had paid some option money to the City of Barcelona, otherwise we could not have exposed the transaction to looking for the investor." Travelstead at 384. Canet testified that the option to purchase the land was obtained at the end of "thirteen months flying to Barcelona." Canet at 243. As Canet observed, one had to get the option to obtain the land first in order for it to be plausible to seek funding for the project. Canet at 242–45. Travelstead's own testimony regarding the need to create value before obtaining project funding supports Canet's observation. *See* Travelstead at 380. As Malcolm Travelstead testified: "[from] day one they were working to get the project to the point that it made sense." M. Travelstead at 514. The option seems to have been acquired in April 1989. Def.Ex. 37.[10]

The court finds that Travelstead did indeed promise Canet a 1988 bonus of $300,-000. Canet received a bonus for every full year he worked for Travelstead except 1988.[11] Def.Ex. 41A. All except that for the first year equaled or exceeded his salary. The assertion in Travelstead's Post-trial Response Brief that "Mr. Travelstead paid no bonus to Mr. Canet for 1987," is in direct conflict with Travelstead's testimony that the Docklands' bonuses were taken from his share of the profits. (Canet's 1987 bonus was paid by Docklands.) Contrast Def. Post–Trial Resp. Brf. at 4 with Travelstead at 367–68. Travelstead's testimony and arguments that he did not grant Canet a bonus in 1988 are not credible. Travelstead testified that he had received substantial profits in 1988 from the McCormick Spice transaction and he had been bought out of his Canary Wharf investment at a profit in 1987. His substantial investment in the Barcelona project in late 1988 and early 1989 demonstrates satisfaction with Canet's efforts, rather than dissatisfaction. Travelstead's attempt to back-date his concern about long-term funding from May 1989 to December 1988 is not credible, given the nascent state of the project in December 1988, and the necessity, which even Travelstead admitted, of obtaining the option before it would be possible to make credible attempts to obtain long-term funding. Travelstead's claim that funds were not available for the bonus is further undercut by the fact that Travelstead had already advanced Canet virtually the entire amount of the bonus in the loan he made to the Canets in mid–1988.

**I. Travelstead's 1988 Loan to the Canets**

In July of 1988 Travelstead loaned the Canets $268,000 to buy a home in Locust Valley, New York, taking back a note and mortgage on the Canets' home in Remsenberg, New York. The Canets claim that Travelstead told them they could pay the loan back from Canet's 1988 bonus. Canet had previously borrowed money from Travelstead against his bonus to purchase living quarters in 1983 and 1985. Canet at 256–58; Travelstead at 453; Pltf.Ex. 4. Moreover, as noted above, Canet received a bonus that exceeded his salary in every year he worked for Travelstead until 1988, except 1982, Canet's first year working for Travelstead, when his bonus was equal to 50% of his salary. Def.Ex. 41A. Following Canet's resignation, Travelstead made a demand on his note on July 28, 1989. In response, Canet filed this action on August 8, 1989. Travelstead counterclaimed on his note on August 28, 1989.

Canet's account makes sense and is accepted by the court as true. Still, the court, having held that Travelstead owes Canet his

10. This Travelstead brochure lists April 1989 as the date of purchase of the land, but Travelstead testified that the land was purchased only after Canet's resignation in June 1989. The June 1989 date for purchase comports with the chronology presented by Canet, with April 1989 as the date the *option* was purchased. Travelstead at 384, 390.

11. Canet's salary in 1988 was $195,000, his 1987 Docklands Bonus was $200,000, and his 1987 Canary Wharf salary and severance was $59,500.

Canet contends that the latter was, in fact, part of his bonus. He also contends that all three income sources are appropriately attributable to Travelstead because of the joint venture between First Boston and Travelstead. His continued work on the project after the sale was a condition of Travelstead's sale of the project. Canet at 304. Travelstead, in fact, testified that the bonuses came from his share of the proceeds of the sale. Travelstead at 367–68. The court accepts Canet's interpretation of his 1987 income.

1988 bonus with interest, need not determine the legal issue tendered by the defendant, that even if Travelstead made the promise that the loan could be repaid out of the bonus, the oral commitment is unenforceable. For the loan issue is now moot, as the enforceability of the loan has been conceded by Canet once the bonus is paid. Pltf. Opening at 13.

## II. Conclusions of Law

There are a number of difficult issues of law to be considered in determining whether the promises that Travelstead made to Canet constitute enforceable contracts. The first is whether the oral employment contract made at the Piccolo Mondo restaurant is an unenforceable oral promise under the Statute of Frauds, N.Y.Gen.Oblig.L. § 5–701, or rather, as a contract for employment-at-will may be enforced as to all terms that constituted integral parts of the employment contract.

The second issue is whether Travelstead's promise of a $300,000 bonus in 1988 to Canet is unenforceable because it was based on past consideration or because a bonus must, under New York law, be considered to be entirely at the discretion of the employer until actually paid or, to the contrary, may be enforced when it constituted " 'an integral part of [the] compensation package.' " *Mirchel v. RMJ Securities Corp.,* 205 A.D.2d 388, 389, 613 N.Y.S.2d 876, 878 (1st Dep't 1994) (citation omitted). The third and, probably, the most difficult issue is whether, under New York law, a promise of equity participation as a term of employment constitutes only an unenforceable agreement to agree, or, as the court holds, in the absence of an express intention not to be bound until there was a written contract, "mutual assent between the parties, even though oral or informal, to exchange acts or promises is sufficient to create a binding contract ..." *Consarc Corp. v. Marine Midland Bank,* 996 F.2d 568 (2d Cir.1993).

## A. Oral Employment Contract Enforceable–Terminable at Will

■ The threshold issue before the court is whether, under New York law, the oral employment agreement made by Travelstead and Canet at the Piccolo Mondo dinner established an enforceable contract with respect to Canet's entitlement, first, to an annual bonus and, second, to equity participation in Travelstead projects. In general, the prohibition on enforcement of oral contracts contained within the Statute of Frauds, N.Y.Gen.Oblig.L. § 5–701, does not apply to employment contracts that are terminable at will, as termination may occur within one year. *Ohanian v. Avis Rent A Car System, Inc.,* 779 F.2d 101, 108 (2d Cir.1985); *Curtis v. Harry Winston, Inc.,* 653 F.Supp. 1504, 1510 (S.D.N.Y.1987) (Broderick, J.); *Zinn v. Bernic Construction Inc.,* 99 Misc.2d 510, 416 N.Y.S.2d 725 (Sup. Ct.Queens County 1979).

A more recent statement, albeit stating conditions for finding a contract *within* the Statute of Frauds, is found in *Zaitsev v. Salomon Brothers, Inc.,* 60 F.3d 1001, 1003 (2d Cir.1995): "Under New York law, however, if performance within one year depends upon an act solely within the control of the party seeking to enforce the oral agreement, the Statute of Frauds remains applicable." Here, it is undisputed that Canet was an employee-at-will, so that both he and Travelstead were free to terminate the agreement at any time. Canet at 272 (cross-examination). Similarly, referring to a contract for investment advice, the Appellate Division–Third Department has held: "The existence of an ongoing, but terminable at will, professional services contractual relationship would not be within the ambit of the Statute of Frauds (General Obligations Law § 5–701[a][1] ) which requires a writing for contracts which, by their own terms, cannot be performed within one year." *DeRubbo v. Wayner Associates,* 192 A.D.2d 889, 596 N.Y.S.2d 568 (3d Dep't 1993).

## B. Enforcement of 1988 Bonus

■ Travelstead's arguments that his promise with regard to the 1988 bonus is unenforceable because it was based on past consideration are not on point because the 1988 commitment supplied the missing term of the bonus provision of the underlying employment contract. Canet clearly established the importance of the bonus and equity participation terms in his decision to go to work

for Travelstead and to continue working for him. *See supra* p. 973. He fully performed under that contract. Travelstead's own description of his statements to Canet regarding the bonus essentially conceded that it was a term of employment, as he acknowledged that he told Canet to *"anticipate a bonus* if you are doing a good job, otherwise you won't have a job ..." Travelstead at 336–37. *See supra* p. 973. Travelstead assisted Canet in *anticipating* his 1988 bonus by loaning him and his wife nearly $300,000 for the purchase of a new home in July 1988, telling them they could pay it back from Canet's bonus. Travelstead secured his loan with a second mortgage on the Canet's second home in Remsenberg. Canet at 256, S. Canet at 109. Further, Travelstead indicated his sense of obligation to pay a bonus, once promised, by his payment of $11,766.65 in interest on Canet's 1985 bonus when he delayed paying it until 1987. Def.Ex. 41A.

Where a bonus constitutes a term of employment and "there exists a reasonable basis for calculating the bonus due an employee, a court may enforce the contract term." *Giuntoli v. Garvin Guybutler Corp.,* 726 F.Supp. 494, 508 (S.D.N.Y.1989). *See also Mirchel v. RMJ Securities Corp.,* 205 A.D.2d 388, 389, 613 N.Y.S.2d 876, 878 (1st Dept.1994) (quoting *Harden v. Warner Amex Cable Communications Inc.,* 642 F.Supp. 1080, 1096 (S.D.N.Y.1986)). In *Mirchel,* the plaintiff had, like Canet, received an advance on his anticipated bonus, secured by an interest-bearing promissory note. The court stated: "Employees in this State may enforce an agreement to pay an annual bonus made at the onset of the employment relationship where such bonus constitutes 'an integral part of plaintiff's compensation package.'" *Id.*

The cases cited by defendant for the proposition that a promise to pay a bonus is unenforceable may be distinguished as they are based on circumstances in which the employer was found to have absolute discretion in granting, or after granting, in paying a bonus, on the basis of written terms of a disclosed bonus plan. In *Sathe v. Bank of N.Y.,* 1990 WL 58862 at *3 (S.D.N.Y. May 2, 1990), an announced bonus was held unenforceable because the employer's written bonus plan stated specifically: "'Nothing in this Plan shall give rise to any special compensation or other sum under this Plan unless and until any such amount shall have been paid to such individual, and prior to such payment the Chairman shall have the power to revoke and nullify any and all steps previously taken towards making any award to any person.'"

In a later case, in *Culver v. Merrill Lynch & Co., Inc.,* 1995 WL 422203 at *3 (S.D.N.Y. July 17, 1995), Judge Sand referred to this case as he summarized the law where an employer's written plan gave the employer "absolute discretion as to the entitlement and amount of any payments thereunder." He found, however, that, unlike the Bank of New York in *Sathe,* the defendant, Merrill Lynch, had not made a showing that its plan contained "such 'magic words'" providing absolute discretion to the employer. He, therefore, refused to dismiss plaintiff's claim.

In *Hall v. United Parcel Service of America, Inc.,* 76 N.Y.2d 27, 37, 556 N.Y.S.2d 21, 555 N.E.2d 273 (1990), the New York Court of Appeals enforced the terms of the UPS plan that limited accrual of rights to a bonus to those who received a specified notice. In *McNabb v. MacAndrews & Forbes Group, Inc.,* 1991 WL 284104 at *6 (S.D.N.Y.1991), aff'd, 972 F.2d 1328 (2d Cir.1992), the plaintiff was denied the bonus he claimed for a year in which he had resigned but had continued to collect his salary under his contract of employment. There, plaintiff's contract specifically stated that the entitlement was "to a bonus '[a]s may be determined by the Board of Directors in its discretion.'" *Accord, Namad v. Salomon Inc.,* 74 N.Y.2d 751, 752, 545 N.Y.S.2d 79, 543 N.E.2d 722 (1989) (Plaintiff's claim, seeking to compel former employer to grant him his 'customary' bonus, was denied as his employment contract specifically stated "... bonuses ... shall be at the discretion of the management.")

In sum, the cases cited by defendant demonstrate that, where contractual provisions assign the employer absolute discretion to grant and pay bonuses, those provisions may be enforced. *Culver* illustrates, however, that such discretion will not be implied when

such language is absent. Here, although Travelstead had the discretion to determine the *amount* of the bonus, a bonus was part of his employment contract with Canet. Canet was entitled to receive payment of his bonus once Travelstead had determined the amount.

Another case cited by defendant for the proposition that a promised bonus may not be enforced may also be readily distinguished. In *Schmidt v. Maiorino*, 209 A.D.2d 683, 619 N.Y.S.2d 139, 140 (2d Dep't 1994), the court dismissed plaintiff's cause of action to enforce oral promises granting her entitlement to future percentage bonuses based on a substantially different employment situation from Canet's. There, the bonus promise was made fourteen years *after* plaintiff began working for the defendant, and, thus, it was not a condition of the original employment contract. Furthermore, in *Schmidt*, plaintiff and defendant were engaged in a meretricious relationship throughout plaintiff's employment.

The conclusion that Travelstead felt himself obligated to pay a bonus once he had specified its amount finds further support in his payment of interest on Canet's 1985 bonus when he failed to pay it until 1987. If a bonus was truly not due until it was paid, as Travelstead asserts, Def. Post Trial Brf. at 5, there would have been no reason for him to pay Canet interest when he delayed payment. Def.Ex. 41A.

### C. Enforcement of Equity Participation
#### (1)

As noted, *supra* pp. 975–77, the court finds that Canet received a net profit participation from Travelstead in Travelstead's interests in 383 Madison, 712 Fifth Avenue, Tower 49, and Canary Wharf in the percentages claimed by Canet. Canet's contribution to these projects was his dedicated service, in effect, "sweat equity." Canet stated that the interest granted by Travelstead in 712 Fifth Avenue was granted in the same terms as the other interests. *Id.* at 301. Travelstead represented that the interest he granted Canet in 712 Fifth Avenue was "[t]en percent of the net profits that I got out of the project, if any." Travelstead at 354. It should be noted that this is, by Travelstead's own definition, one form of equity participation and was the form he in fact fulfilled at least partially with respect to 712 Fifth Avenue and Canary Wharf. Travelstead at 337. It may then be appropriate to infer that the other interests granted by Travelstead were effectively net profit interests in Travelstead's interest in the referenced project and that this form represented his intent in making the offer.

The participation Travelstead granted to the four Canary Wharf staff members, leaving aside the question of whether it completely fulfilled Travelstead's commitment to Canet, was also of this nature. Travelstead, himself, described the interest he gave these staff members as "a net profit interest." Travelstead at 362. In these projects that preceded Barcelona, Canet's interests were relatively small—a pro rata share seemingly based on Travelstead's evaluation of Canet's personal contribution as against his own personal and capital investment. Although the nature of the Barcelona project also fits within the law of joint ventures, *see infra*, pp. 988–89, it might, in the alternative, also be considered as a "net profit interest."

By including such interests as part of his offer of employment to Canet, Travelstead may have expected to obtain a higher level of dedication, based on Canet's sense that he had ownership of the projects on which he worked. Uncontradicted testimony indicated that Canet did provide just such dedication. In addition, Canet had a voice in the management of the enterprise. There was extensive testimony that Travelstead announced to Canet and to other business associates that Canet was "his partner." Another way of phrasing this is to say that Canet was a general partner of Travelstead in a general partnership whose principal asset was an interest in Travelstead's limited partnerships.

The understanding with respect to all the projects prior to the Barcelona project was that Canet stood to gain if the project succeeded in relation to his relatively small per-

centage interest gained as sweat equity.[12] Similarly, he stood to lose his sweat equity if the project went under. He would not, however, and did not expect to, lose anything more than his "capital contribution" in the form of "sweat equity." With respect to Barcelona, where he had a much larger share in recognition of his role as director of the project, his share, again would exceed his anticipated capital contribution. Still, it is clear he expected to make a contribution to capital. Canet at 244–47.

One view of these equity interests created by Travelstead's offers is that they were "net profit payout" interests, Travelstead at 338, representing another form of incentive compensation that, like the bonus, was included as an integral term of the employment contract. *See, Smith v. Horsehead Industries, Inc.,* 1995 WL 406024, *5 (S.D.N.Y. July 10, 1995), *Mann v. Helmsley–Spear, Inc.,* 177 A.D.2d 147, 581 N.Y.S.2d 16 (1st Dep't 1992), *Raes v. So–Lite Furniture Corp.,* 4 A.D.2d 851, 166 N.Y.S.2d 471 (4th Dep't 1957). A "net profit payout" interest is somewhat akin to commission sales percentage, whose enforceability was codified in the Labor Law § 191(1).

■ Travelstead also argues that Canet's equity participation claims are barred by the Statute of Frauds.[13] This is misplaced for several reasons. New York General Obligations Law § 5–701(a) provides, in pertinent part:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be changed therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> 1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime . . .

The statutory provision is inapplicable here: first, it is undisputed that Canet's employment contract was one for employment at will, capable of performance within one year. Second, even viewing the grants of equity participation as independent contracts, they were capable of performance within a year given the very real possibility that Travelstead would sell a development project prior to its completion. *See Blake v. Voight,* 134 N.Y. 69, 75, 31 N.E. 256 (1892): "Where the parties agree to carry on business for a period exceeding one year, or until the happening of an event which may transpire before the end of the year, we think that by principle, as well as by the weight of authority, the contract is protected from the operation of the statute." Also, *id.* at 73, 31 N.E. 256: "The contingency did not defeat the contract, but simply advanced the period of fulfillment."

Ordinarily, Travelstead's participation in development projects did not continue to the completion of the project. The fact that the point at which the Travelstead interest in a development project was sold generally occurred more than a year after his offer of an interest to Canet should not obscure the fact that the interest *could have been sold* prior to the expiration of a year. In Canary Wharf, for instance, the offer of a percentage interest was made at a time Travelstead knew the project would be sold in the near future. Travelstead at 360.

In *Freedman v. Chemical Construction Corp.,* 43 N.Y.2d 260, 262–63, 401 N.Y.S.2d 176, 372 N.E.2d 12 (1977), the New York Court of Appeals held the one year rule of the Statute of Frauds did not bar suit on an oral contract to procure "defendant a contract to build a chemical plant in Saudi Arabia" because "the alleged agreement was 'by its terms,' even if not as a practical matter,

---

**12.** This is true despite the fact that Travelstead was often personally at risk for the financing of projects because he provided personal guarantees for debt. The exposure for these loans was part of Travelstead's contribution to the venture, as Canet's sweat equity was his. These loans were, of course, repaid when a project was sold or obtained longer term, non-recourse, funding,

but the greater risk assumed by Travelstead was reflected in the greater return he received.

**13.** The inapplicability of the Statute of Frauds, if these equity interests are viewed as incentive compensation under the employment contract, is discussed *supra* p. 984.

performable within a year."[14] Similarly, in *Mann v. Helmsley–Spear, Inc.*, 177 A.D.2d 147, 581 N.Y.S.2d 16 (1st Dep't 1992), the court held that the Statute of Frauds one year provision did not bar enforcement of a promise of a bonus upon completion of the cooperative conversion of two Manhattan apartment buildings. " 'The test, then, is possibility or impossibility, rather than probability or improbability, of performance within the statutory period.' " *Id.* at 150, 581 N.Y.S.2d at 18 (Quoting 56 NY Jur., Statute of Frauds, § 19.).

### (2)

■ A joint venture was created by Travelstead and Canet's agreements with respect to the project connected to the Barcelona Olympics of 1992. " 'No particular form of expression is required to create ... (a joint venture) agreement apart from the requirements generally applicable to simple contracts.' " *Yonofsky v. Wernick*, 362 F.Supp. 1005, 1025 (S.D.N.Y.1973) (quoting *Wooten v. Marshall*, 153 F.Supp. 759, 763 (S.D.N.Y.1957)). The New York Court of Appeals stated the requirements for finding that a joint venture existed in *Steinbeck v. Gerosa*, 4 N.Y.2d 302, 317, 175 N.Y.S.2d 1, 151 N.E.2d 170 (1958) (citation for quotation in opinion omitted):

> 'The ultimate inquiry is whether the parties have so joined their property, interests, skills and risks that for the purpose of the particular adventure their respective contributions have become as one and the commingled property and interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit.'

Further, "[a] joint venture is generally defined as 'a "special combination of two or more persons where in some specific venture a profit is jointly sought without any actual partnership or corporate designation." ' " *Chalmers v. Eaton Corp.*, 71 A.D.2d 721, 722, 419 N.Y.S.2d 217 (3d Dep't 1979) (quoting *Forman v. Lumm*, 214 App.Div. 579, 583, 212 N.Y.S. 487.)

In the Barcelona development project, Canet took on the leadership role. His relationship with Travelstead was substantially different with respect to this project than it had been on previous projects. Canet expressed his willingness to undertake recourse debt in connection with this project. Canet at 247. Travelstead and Canet clearly "joined their property, interests, skills and risks," *Steinbeck* at 317, 175 N.Y.S.2d 1, 151 N.E.2d 170.

Travelstead concedes that he offered a partnership to Canet on the project, but asserts that it was based on a condition precedent that was never fulfilled, that Canet obtain financial backing for the project. Travelstead at 377. Canet asserts that, to the contrary, a partnership was formed with the original agreement, modified several times by mutual consent, and then unilaterally dissolved by Travelstead's effort to change the percentage held by Canet in May, 1989. Canet at 245–50, 268–72.

■ With a joint venture, it is a question of fact whether the relationship is at will or until the accomplishment of a particular undertaking. *Hooker Chemicals & Plastics Corp. v. International Minerals & Chemical Corp.*, 90 A.D.2d 991, 992, 456 N.Y.S.2d 587 (4th Dep't 1982). The Court holds that the Barcelona venture was not at will but was for the accomplishment of a particular undertaking, the development of the project either for sale to a third party prior to completion or to completion. Thus Canet is entitled not only to an accounting, but also to damages resulting from Travelstead's breach of their joint venture agreement. *LaFleur v. Montgomery*, 70 A.D.2d 545, 416 N.Y.S.2d 602 (1st Dep't 1979); *Crownshield Trading Corp. v. Earle*, 200 A.D. 10, 192 N.Y.S. 304 (1st Dep't 1922).

■ Moreover, unless a joint venture agreement contains an express term for a period exceeding one year, under New York law, it is presumed to be capable of accomplishment within a year. "The statements that the New York statute of frauds does not apply to joint ventures doubtless arise from

---

**14.** The *Freedman* court did bar the suit on the basis of subdivision 10 of the Statute of Frauds, which bars enforcement of oral contracts for "negotiating ... a business opportunity."

the fact that joint ventures are usually not for a stated term but for a stated purpose, and the implicit assumption that, however unlikely, this purpose could be achieved within one year." *Ebker v. Tan Jay Intern., Ltd.,* 739 F.2d 812, 827 (2d Cir.1984).[15]

■ Canet was a joint venturer with Travelstead in the Barcelona project on the basis of Canet's leadership role and the recourse debt he expressed willingness to assume. In addition, Canet evidenced his willingness to accept a reduction to a forty percent share from the previous sixty-forty and fifty-fifty divisions. Travelstead's unilateral change in the allocation of interests in the venture was a breach that entitles Canet to damages or an accounting, or both, as appropriate.

### (3)

■ Travelstead asserts that, with respect to the equity participation component of the employment contract, he and Canet reached, at most, an "agreement to agree" that was unenforceable as it was understood to require a binding writing to be effective. However, where equity participation was a term of employment that had been stated in the defendant's offer of employment to the plaintiff, the court held, in *Smith v. Horsehead Industries, Inc.,* 1995 WL 406024, \*5 (S.D.N.Y. July 10, 1995): that "the Court cannot conclude that the terms of Smith's employment letter concerning his participation in the equity plan are too vague to be enforced." In *Knapp v. McFarland,* 344 F.Supp. 601, 612 (S.D.N.Y.1971), *aff'd in part* and *rev'd in part on other grounds,* 457 F.2d 881 (2d Cir.), *cert. denied,* 409 U.S. 850, 93 S.Ct. 59, 34 L.Ed.2d 92 (1972), the district court noted that: "in suits ... predicated upon the enforcement of agreements [to provide additional compensation in an unstated amount] for services which have been fully performed prior to the commencement of the action, the courts are more inclined to characterize such contracts as enforceable." Its holding that " 'agreements to agree' are illusory and, therefore, unenforceable ... has no

application in the context of interpreting employment contracts which include open additional compensation clauses," *id.,* is still valid so long as subsequent agreement fleshes out the missing material terms, as was done here.

The power of the court to set missing material terms was, however, limited by the decision of the New York Court of Appeals in *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981), where the Court held that contracts, written and oral, may only be enforced if they are:

> ... sufficiently certain and specific so that what was promised can be ascertained. Otherwise, a court, in intervening, would be imposing its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which they have mutually committed themselves. Thus, definiteness as to material matters is of the very essence in contract law. Impenetrable vagueness and uncertainty will not do.

*Id.* at 109, 436 N.Y.S.2d 247, 417 N.E.2d 541.

The Canet–Travelstead employment agreement clearly contained two indefinite material terms, the amount of the bonus and the amount and nature of the equity participations. However, as the New York Court of Appeals continued, in *Joseph Martin, Jr., Delicatessen* at 110, 436 N.Y.S.2d 247, 417 N.E.2d 541, the requirement for definiteness reflected "concern ... with substance, not form." The court stated that an agreement would not fail for indefiniteness where "it invited recourse to an objective extrinsic event, condition or standard on which the amount was made to depend." *Id.* Canet has established that the otherwise undefined amounts of his 1988 bonus and his equity participation in percentage amount by project were, in fact, set by Travelstead and accepted by him.

■ The modern view of contracts holds that "the reasonable expectations of the par-

---

**15.** The Statute of Frauds is inapplicable as a defense to any of Canet's claims. *See* discussion of the inapplicability of the Statute of Frauds as a defense to the employment contract, *supra* at p. 987, and to equity participation, *supra* at p. 984.

ties entering into the contract" should, if possible, be honored. Even with some indefinite terms, such a commitment is enforceable, and thus not a mere "agreement to agree," where a method to determine the nature of promised equity participation is available. *Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.,* 74 N.Y.2d 475, 483, 548 N.Y.S.2d 920, 548 N.E.2d 203 (1989). *See also, Teachers Ins. & Annuity Ass'n of America v. Tribune Co.,* 670 F.Supp. 491, 498 (S.D.N.Y.1987) (Leval, J.). In *Horsehead Industries, Inc.,* at *6 (quoting 1 Corbin on Contract § 4.1 at 536), the district court held that an equity participation plan promised in an offer of employment might be enforced where: "there is some method of determining the nature of the plan and [plaintiff's] entitlement according to the provisions of that plan that is more concrete than 'wish, will and desire.'"

■ The Second Circuit has established a standard for determining the enforceability of an oral contract or other unexecuted contract when a written contract is contemplated, in *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80–81 (1986):

> We have articulated several factors that help determine whether the parties intended to be bound in the absence of a document executed by both sides. The court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

The first *Winston* factor for determining if an oral contract may be enforced when a written agreement was contemplated is whether the party sought to be bound expressly reserved the right not to be bound in the absence of a writing. This factor does not militate against enforcement of Canet's oral employment agreement and the subsequent agreements with regard to the magnitude of the equity participations. Neither Travelstead nor Canet made any express reservation of the right not to be bound in the

absence of the writing at the time the employment contract was made nor at the time the modifications were agreed upon by Travelstead and Canet to specify the amount of Canet's equity participation in individual projects. A hidden intent on the part of Travelstead not to be bound to his commitments to Canet with regard to equity participation in the absence of a written agreement is not sufficient—a reservation of this right by Travelstead would have had to be express.

"[T]wo widely-accepted common law principles [are] (a) that absent an expressed intent that no contract shall exist, mutual assent between the parties, even though oral or informal, to exchange acts or promises is sufficient to create a binding contract; and (b) that to avoid the obligation of a binding contract, at least one of the parties must express an intention not to be bound until a writing is executed." *Consarc Corp. v. Marine Midland Bank,* 996 F.2d 568 (2d Cir. 1993). Moreover, Travelstead demonstrated to Canet his expectation of being bound by several of his oral commitments of equity participation: he sought Canet's assent before rolling up Canet's South Shore and Silas Creek interests into 383 Madison; he honored, at least in part, oral commitments he made to Canet with regard to 712 Fifth Avenue and Canary Wharf; and he renegotiated the Barcelona percentages as though Canet's share was not mere fiat on his part. These actions gave Canet a reasonable expectation that Travelstead intended to be bound by their oral agreements.

The cases cited by Travelstead are not to the contrary. In *International Telemeter Corp. v. Teleprompter Corp.,* 592 F.2d 49, 55 (2d Cir.1979), the Second Circuit held that an agreement that had not been signed and delivered was still enforceable because the parties had "manifested objective indications of their intent to be bound." The court noted the consistency of this holding with a long line of New York cases that dealt with similar circumstances. In contrast, the Second Circuit's holding, in *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74–75 (1984), that an oral "handshake agreement" did not constitute a binding agreement, was based on the "parties' expressed intentions,"

the "forthright, reasonable signals [given by the party sought to be bound] that it means to be bound only by a written agreement." In *R.G. Group*, the defendant had provided the plaintiff with its form contract that included the provision "that the entire agreement, and any modifications, be in writing and signed by the parties." *Id.* at 71. Furthermore, "there was no performance, partial or otherwise, by either party." *Id.* at 76.

In *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (1984), the Second Circuit stated that express intent of the party sought to be bound must be ascertained in order to determine whether parties intend to be bound prior to the execution of a formal document. In *Reprosystem*, the court found that the defendant had clearly and repeatedly expressed its intent to be bound only after a formal agreement was executed. It specifically stated that in its offer, all its draft agreements, its press release announcing the deal, and a filing with the Securities and Exchange Commission. The *Reprosystem* court noted, however, that the rules emphasize "intention rather than form." *Id.* at 261. The court stated further that: "the party invoking the first rule of New York contract law [where parties do not intend to be bound until they have executed a formal document embodying their agreement, they will not be bound until then] must prove either that both parties understood they were not to be bound until the executed contract was delivered, or that the other party should have known that the disclaiming party did not intend to be bound before the contract was signed." The second rule, the court continued, is: "[T]he mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event." *Id.*

Travelstead's arguments that Canet's repeated insistence on obtaining documentation indicated his expectation that such documentation was required to bind the agreements are unconvincing. The court finds that Canet wanted the agreements in writing because, as a business person and, not insignificantly, knowing Travelstead's personality and litigious history, E. Canet at 245, 263–64, he did

not want to be put in the position of having to engage in a "swearing contest," but rather wanted documentation to confirm the oral agreements and maximize tax benefits. Indicative of his belief in the validity of the agreements was his continued work for Travelstead, his performance of his part of their deal. When he finally became convinced that Travelstead was attempting to alter unilaterally the terms of their division of equity in the Barcelona project, Canet quit.

Travelstead had offered employment to Canet on terms that included equity participation and substantial bonuses and had received the benefits of Canet's capable, dedicated and loyal performance in return. Travelstead made offers that filled in the missing quantum term of both bonus and equity share provisions which were then relied upon by Canet. Travelstead engaged several times in renegotiation of shares in terms that gave rise to Canet's reasonable expectation that Travelstead intended that an agreed-upon share arrangement was operative until it was either modified by mutual consent or fulfilled. Travelstead never stated that he did not intend to be bound without formal signed documents. That Canet was able to determine by 1989 that Travelstead was not a man of his word, even when it was given to a close associate and friend, following incomplete fulfillment of the equity participation portion of his employment agreement, does not mean that Travelstead gave express notice in 1981, or thereafter, up to 1989, that he would be bound only by written agreements.

The second *Winston* factor for determining if an oral contract may be enforced when a written agreement was contemplated is partial performance. Canet fully performed according to their agreement and Travelstead had partially performed under the employment contract—he paid Canet the salary he had offered him, he paid him substantial bonuses for every year until 1988, and he provided Canet a share of his profits on 712 5th Avenue in 1985—all without written agreements. *See* Canet at 226–28.

Here, the full performance by the plaintiff and the substantial amount of performance by the defendant strongly supports enforce-

ment of the oral agreement. Canet's performance as Travelstead's right hand man demonstrated dedication and complete loyalty to Travelstead and his projects [16] in a way that the First Boston staff directed by Travelstead could not, because their prime loyalty had to be to their employer, First Boston. This performance was induced by an employment agreement that included a promise of equity participation in the projects on which he worked. The promise of equity participation was a significant incentive to Canet to work in the risky world of real estate development for a small concern rather than to pursue a more secure career in investment banking with a large institution. *See* Dunlevy at 181. Here, it is worth noting that, following his separation from Travelstead's enterprises, Canet returned to work for an investment bank. *See Def. Post-trial Resp. Brf.* at 16.

There was also partial performance by Travelstead, without a written agreement, when he transferred 10% of his profits on 712 Fifth Avenue and when, during the restructuring with First Boston, he designated a portion of his Canary Wharf carried interest to the staff to whom he had committed it. (The remaining disputes with regard to Travelstead's fulfillment of his commitments should not obscure the degree to which, on 712 Fifth Avenue and Canary Wharf, he provided Canet equity participation without a prior writing.)

The third *Winston* factor for determining if an oral contract may be enforced when a written agreement was contemplated is whether all the terms of the alleged contract have been agreed upon. This factor was clearly not satisfied with regard to amounts of bonuses nor of equity participation at the time the employment contract was formed. However, subsequent agreements established the missing terms when Travelstead and Canet agreed on percentage interests in pro-

jects and when Travelstead specified the amount of a bonus.

Although the agreed-upon project participations might have been subjected to complex conditions, particularly to take advantage of tax provisions available prior to 1987, they are sufficient to permit a court to fill in the remaining terms. The alternative, to treat a promise as meaningless, "is at best a last resort. Indefiniteness must reach the point where construction becomes futile." *Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co., Inc.,* 232 N.Y. 112, 133 N.E. 370 (1921) (citations omitted). In all the equity participations (leaving Barcelona for a separate discussion) offered by Travelstead to Canet, the percentage was specified by Travelstead and agreed to by Canet. More recently, in *Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.,* 74 N.Y.2d 475, 483, 548 N.Y.S.2d 920, 548 N.E.2d 203 (1989), the Court of Appeals stated, citing *Cohen & Sons:* "Before rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear."

Another recent statement of the importance of honoring contract expectations noted: "It is ... the aim of contract law to gratify, not to defeat, expectations that arise out of intended contractual agreement, despite informality or the need for further proceedings between the parties." *Teachers Ins. & Annuity Ass'n of America v. Tribune Co. [TIAA ]*, 670 F.Supp. 491, 498 (S.D.N.Y. 1987). In *TIAA,* there had been no performance by either party and the intended agreement involved many technical accounting and tax provisions, some of which were undetermined. The preliminary assent made by the defendant acknowledged open terms but stated that it was "a binding agreement." Subsequently, the defendant refused to ac-

---

**16.** It is noteworthy that the act of disloyalty that Travelstead ascribed to Canet upon his departure in 1989, contacting the Colleys and encouraging them to pull their money out of the Barcelona project, was specifically contradicted by both Eugene and Bruce Colley, who testified that they contacted Canet only when Travelstead did not return their calls, and only then did they learn from him that he was no longer associated with

the project. Bruce Colley confirmed unequivocally that Canet had not "instigate[d] the [Colley] lawsuit" that froze Travelstead's assets. E. Colley at 195–96; B. Colley at 523–25. No evidence was presented that even after his resignation, Canet failed to display that "punctilio of honor" Judge Cardozo stated was required in actions affecting partnerships. *Meinhard v. Salmon,* 249 N.Y. 458, 463, 164 N.E. 545 (1928).

cept a final, formal agreement or even continue to negotiate in good faith. On these facts, Judge Leval held that a legally binding agreement had been reached. Not unlike Travelstead, who offered equity participation in projects when he wanted Canet to become his right hand man, but later did not want to share his gains, the Tribune Company wanted a firm loan commitment from TIAA at the time it signed the preliminary agreement but later sought to disown the deal. Travelstead, like the Tribune Company in *TIAA,* at the least: "undertook a binding commitment to negotiate open terms in good faith and breached that commitment," when he offered Canet equity participation in the projects he worked on and thereafter failed to make a good faith effort to provide it, while accepting Canet's performance. *TIAA* at 508.

The last of the factors prescribed by the Second Circuit in *Winston* for determining if an oral contract may be enforced when a written agreement was contemplated is whether the agreement at issue is the type of contract that is usually committed to writing. In this case, the evidence points overwhelmingly in one direction if one treats the employment contract, as amended by later agreements, as the source of all obligations, while it is less definitive if the grants of percentage interests in specific projects are treated as independent contracts. Although employment contracts may be in writing, they often are not. No evidence was presented that Travelstead made a practice of putting employment contracts in writing. Indeed, defendant's brother testified that he had been unable to obtain a letter from his brother specifying his salary when he returned to work for him on the Barcelona project in February 1989. M. Travelstead at 517.

■ Focusing, as Travelstead would have us, on the agreements to grant percentage interests in Travelstead's interest in real property developments, it is true that such agreements are more likely to be written. Although interests in real property require

writings to effectuate transfer, interests in a partnership or corporation holding an interest in real property may be transferred without a writing. *Yonofsky v. Wernick,* 362 F.Supp. 1005, 1025 (S.D.N.Y.1973) ("As to [ventures to deal in realty] the realty is viewed as personal property among the partners to the venture, and the requirement of the statute of frauds relating to real property are not applicable." (Citations omitted.).) As noted, Travelstead, in fact, granted Canet interests in his profits from 712 Fifth Avenue and Canary Wharf without a writing.

Travelstead's final argument on this point that Canet had constructive notice that "Travelstead insisted upon entering into written agreements in order to embody, define and protect his rights in relation to other parties," Def. Post-trial Brf. at 50, is undermined by the 712 Fifth Avenue arrangement in which Travelstead granted and then, in 1985, paid 10% of his profits to Canet without any written agreement. *Burian v. Kurtz,* 1990 WL 74549 (S.D.N.Y. May 30, 1990), cited by defendant, is not to the contrary. There, the presence of written releases of the interests claimed by plaintiff and the absence of "any writing reflecting what was apparently the most important stock deal of his life" was held to deny the plaintiff, who was "a sophisticated investor," recovery against his former employer who had allegedly promised him a 25% share in his company. In *Burian,* the plaintiff twice signed documents, allegedly without reading them, that released his employer from the prior oral agreements to transfer to him 25% ownership of the employer's company. There, in addition, the plaintiff signed broker-dealer registration forms that stated his share of the company was between 5% and 10%, rather than the 25% he claimed in his suit.[17] *Id.* at *4, *9.

### (4)

■ As an alternative argument, Travelstead contends that his promises of equity participation were oral contracts that anticipated written, limited partnership contracts and, as such, were unenforceable because

---

17. A further distinction exists between the case presented by Canet's claim and that in *Burian.* There, in addition to the writings in which plaintiff had disclaimed the claimed interest, the plaintiff lacked corroborating witnesses, *id.* at *7–8, Canet's testimony, however, was corroborated by numerous witnesses and circumstantial evidence. *See supra* p. 975.

limited partnership agreements require a writing under New York law. He is correct in his assertion that, in New York, a limited partnership must be in writing, but the impact of this verity of law is quite different than that claimed by Travelstead. The fact that there was no writing meant merely that the interest Travelstead transferred, each time he and Canet agreed on Canet's percentage interest in a project, was not a limited partnership. Travelstead himself testified that equity participation came in the form of net profit participation and general partnerships as well as limited partnerships. Travelstead at 337. Although further refinement of the interest granted to Canet might have been accomplished by the drafting of limited partnership agreements that might have enhanced the value of the interest, especially prior to the tax law changes of 1986, the grant was complete when the percentage was specified.

■ Travelstead's reliance on Canet's expectation that he would be a limited partner is, therefore, misplaced. A failed effort to create a limited partnership may create a general partnership, despite the expectations of the party. *See Peerless Mills v. American Telephone & Telegraph Co.,* 527 F.2d 445, 449 n. 1 (2d Cir.1975) ("Failure to comply with [the ULPA] requirements for establishing a limited partnership precludes the formation of such a partnership, but instead renders the association a general partnership; in other words, a partnership is formed, albeit not a limited one.")

### (5)

A related argument concerning the absence of a writing as an impediment to enforcement of the agreement concerns the effect contractual provisions limiting the right of assignment upon third parties. Travelstead maintains that the formal provisions of limited partnerships prevent Canet from asserting an interest in Travelstead's interest in the limited partnerships. A specific clause of the Madisonstead limited partnership agreement was cited both illustratively and for its implications regarding Canet's claim related to the 383 Madison Avenue project. Def.Opening at 45. This argument, however, overlooks the actual language of the Madisonstead provision, cited in that argument, which states that such an agreement "shall not be effective against the Partnership." *Id.* at 61. As Canet's claim is against Travelstead, not the partnership, it is not clear why the defense is relevant.

■ Inability to enforce an oral agreement in which an interest in a partnership is granted against that partnership, a third party without notice, does not lead to the conclusion that the absence of a writing is an impediment to the enforcement of such a grant, otherwise enforceable, against its maker. *See Goldberger v. Sonn,* 179 A.D.2d 573, 574, 579 N.Y.S.2d 52 (1st Dep't 1992) ("'The duty to amend the partnership certificate was the responsibility of the partnership and as such does not negate [intervening plaintiff's] limited partnership status. Indeed, the amendment of the certificate is mainly for the benefit of [sic] protection of the limited partner in regards to third parties. The amendment (or the lack thereof) does not affect the limited partnership status as far as the instant parties are concerned.") (Citations omitted.) *See also Peerless Mills, Inc. v. American Tel. & Tel. Co.,* 527 F.2d 445, 449 n. 1 (2d Cir.1975) ("[P]urpose of recording certificate of limited partnership is to acquaint third persons dealing with the partnership with its status. Hence, when neither the rights of third parties or a partner's claim of limited liability is involved, failure to record the certificate cannot affect the existence of a limited partnership insofar as the partners, inter se, are concerned"). (Summarizing *Hoefer v. Hall,* 75 N.M. 751, 411 P.2d 230, 233 (1965).).

In another case cited by defendant for the proposition that contractual language could limit the rights of a third party, *Pro Cardiaco Pronto Socorro Cardiologica S.A. v. Trussell,* 863 F.Supp. 135 (S.D.N.Y.1994), the court's holding was exactly the reverse. There, an insurer who paid the insured after receiving notice that the insured's claim had been assigned to the treating hospital was held liable to the hospital despite a certificate of insurance that stated "that payments for foreign hospital expenses could be made only to the insured." *Id.* at 136. The law re-

quires, for an assignment to be ineffective, it must be "expressly made void." *Id.* at 138. The language in the Madisonstead agreement merely makes an assignment ineffective "against the Partnership," which has not been given notice of it. It does not limit enforcement of an assignment against its maker. In any event, the issue before the court is not enforcement of an assignment against the limited partnerships, but rather against the maker of the assignment.

### (6)

Finally, Travelstead argues that Canet failed to perform as a partner and thus cannot be entitled to a share of the projects as he had offered. He testified at trial that a partner would have been expected to make capital contributions. Travelstead at 349, 378, 393–95, 414. However, the evidence is clear and convincing that the contribution expected from Canet for his small share of Travelstead's interests was "sweat equity," not capital. *See supra* note 12.

Travelstead's offers of shares of ten percent or less in projects accepted by Canet (with the exception of Barcelona), as a return for the dedication and loyalty Travelstead received from Canet, is entirely consistent with Travelstead's grant to Canet of a percentage of his profit in 712 Fifth Avenue, Travelstead's acknowledged grants of equity in Canary Wharf to Canet and other Canary Wharf staff as well as offers of equity to Canet, Malcolm Travelstead and Fred Rovet on the Barcelona project. And, it should be noted, no capital contributions were sought from or made by these other grantees. *See* Travelstead at 355–57, 360–68, 377–88, 392–95; M. Travelstead at 493–95; Rovet at 429–31. The 383 Madison Associates limited partnership agreement, in fact, contains language specifically authorizing the partners to grant up to "a 10% Percentage Interest to its senior or executive employees or to senior or executive employees of an Affiliate of such Partner." Def.Ex. 8 at ¶ 7.3(b). Quoted in Def.Post Trial Brf. at 61.

Further, the agreements as to percentage shares typically (with the significant exception of the Barcelona project) were made after the project was well underway, at a time where capital was less a consideration than at the initiation of the project. *See supra* pp. 975–77. Indeed, the offer and acceptance of these interests, other than Barcelona, ordinarily occurred after the project had been developed to the point that realization of profit was in sight. This also reinforces the finding that no capital contribution was expected from the grantee but that the amount was based on the sweat equity the employee had in the project.

### D. Canet's Labor Law Claim for Attorneys' Fees and Costs

Canet has claimed entitlement to attorneys' fees and costs in connection with his prosecution of this suit under N.Y.Labor L. § 198, arguing that his unpaid bonus constituted "wages" under that law. The court disagrees. The weight of authority holds that incentive compensation does not constitute "wages" under the New York Labor Law. *See Tischmann v. ITT/Sheraton Corp.,* 882 F.Supp. 1358, 1369 (S.D.N.Y.1995) (Kram, J.) ("Under New York law, incentive compensation based on factors falling outside the scope of the employee's actual work is precluded from statutory coverage.") (Collecting cases.); *Magness v. Human Resource Services, Inc.,* 161 A.D.2d 418, 419, 555 N.Y.S.2d 347, 349 (1st Dep't 1990) ("Under the contract, however, 'supplemental income' is clearly incentive compensation and not 'wages' pursuant to Labor Law § 190(1)."); *Dean Witter Reynolds, Inc. v. Ross,* 75 A.D.2d 373, 381, 429 N.Y.S.2d 653, 658 (1st Dep't 1980) ("The term 'wages' despite its broad definition (§ 190(1)) does not encompass an incentive compensation plan."); *Saverino v. American Express Bank, Ltd.,* 10/17/95 N.Y.L.J. 26, (col. 5) (Sup.N.Y.County). *Contra Westheim v. Elkay Industries, Inc.,* 166 A.D.2d 318, 560 N.Y.S.2d 779 (1st Dep't 1990); *Watson v. Prentice–Hall, Inc.,* 50 A.D.2d 1077, 376 N.Y.S.2d 339 (4th Dep't 1975) (Plaintiff was, however, a commission salesman whose bonus was a percentage of his own sales.).

In *Gottlieb v. Laub & Co., Inc.,* 82 N.Y.2d 457, 459, 605 N.Y.S.2d 213, 626 N.E.2d 29 (1993), the New York Court of Appeals held that "the intent of the statute [Labor Law § 198(1–a) ] is that the attorney's fees reme-

dy provided therein is limited to wage claims based upon violations of one or more of the substantive provisions of Labor Law article 6." As Canet's claims for bonus and for equity participations are for incentive compensation that does not constitute wages under the New York Labor Law, he has no statutory claim. His claim for attorneys' fees must, therefore, be denied.

### Conclusion

The court, therefore, for the reasons stated above, grants Eduardo Canet's claims against Gooch Ware Travelstead as follows:

- a two percent interest in Travelstead's interest in 383 Madison;
- an accounting with respect to whether Travelstead paid Canet the full amount to which he was entitled for his 10 percent net profit interest in 712 Fifth Avenue, with interest on any remaining amount due from the date(s) Travelstead received the proceeds from its sale;
- a one-half percent share in Travelstead's profits and any remaining property interest in the Tower 49 project, with interest from the date(s) Travelstead received the proceeds from its sale;
- a seven and one-half percent share in Travelstead's interest in the net proceeds received and in any remaining property rights in connection with the Canary Wharf project, with interest from the date(s) Travelstead received the proceeds from its sale;
- a ten percent share in Travelstead's profits from the sale of his McCormick Spice Company shares at the end of that 1988 project, with interest from the date(s) Travelstead received the proceeds from its sale; and
- a forty percent share in Travelstead's interest in the net proceeds received and remaining property rights in connection with the Barcelona project, with interest from the date(s) Travelstead received the proceeds from its sale.

Canet's claim for his 1988 bonus is also granted, with interest from January 1989. Canet's claim for attorneys' fees under the New York State Labor Law is denied. Travelstead's counterclaim for enforcement of his loan is granted upon consent, in light of plaintiff's agreement to pay it upon defendant's payment of his 1988 bonus.