**In re CIS CORPORATION, Continental Information Systems Corporation, et al., Debtor.**

**Patrick R. MONACO, Plaintiff,**

v.

**CIS CORP., Defendant.**

**Bankruptcy Nos. 89–B–10073 (PBA) to 89–B–10084 (PBA). Adv. No. 93–9830A.**

United States Bankruptcy Court, S.D. New York.

March 26, 1997.

Scolaro, Shulman, Cohen, Lawler & Burstein, P.C., Syracuse, N.Y. by Colin A. Fieman, for Plaintiff, Patrick Monaco.

Kirkland & Ellis, New York City by Bonnie Host and Jean Reed Haynes, for Trustee–Defendant.

## MEMORANDUM DECISION ON COUNTS TWO AND THREE OF PLAINTIFF'S COMPLAINT GRANTING IN PART AND DENYING IN PART CROSS–MOTIONS FOR SUMMARY JUDGMENT

PRUDENCE CARTER BEATTY,[*] Bankruptcy Judge.

This adversary proceeding was commenced by a former employee of the debtors for payment of vacation pay and of commissions alleged to be due him. The Chapter 11 Trustee moved for partial summary judgment on the six count complaint. The employee opposed that motion and filed a cross-motion for partial summary judgment. This court made an oral ruling against the employee on Counts One, Four and Five, requested supplemental papers on Count Two, and took Counts Two and Three under advisement.[1]

This decision deals with Counts Two and Three of the complaint. Count Two seeks commission payments with respect to two transactions. For the reasons more fully set forth below, this court holds that the employee is not entitled to the commission payments he seeks in Count Two. Thus, the Trustee's motion for partial summary judgment will be granted as to Count Two.

As to the claims made in Count Three for liquidated damages and attorneys' fees under New York Labor Law § 190 et. seq. with respect to commissions and unpaid vacation pay conceded to be owing the employee, this court holds that the employee is entitled to recover liquidated damages and attorneys' fees. However, the employee is not entitled to any relief under the New York Labor Law in connection with the commissions he sought unsuccessfully. The request for pre-judg-

---

[*] Formerly known as Prudence Beatty Abram.

1. The commissions sought in the first and second counts totalled $68,392. In Counts Four and Five, the employee urged his entitlement to these same commissions under the doctrine of quantum meruit, and also argued under a theory of promissory estoppel that he was entitled to an additional amount of $900,000. He voluntarily withdrew his sixth claim of age discrimination.

ment interest is denied and interest is to be calculated from the date of judgment only.

### STATEMENT OF FACTS

1. These Chapter 11 cases were commenced on January 13, 1989 when CIS and a number of its affiliates and subsidiaries (collectively "CIS" or the "Debtors") filed Chapter 11 petitions. The Debtors remained as debtors in possession until James P. Hassett was appointed Chapter 11 Trustee (the "Trustee") in late October 1989.

2. The employment of Patrick R. Monaco (the "Employee" or "Monaco") with CIS began in 1987 upon CIS' acquisition of the company with which Monaco had been employed since 1978. On the filing date, Monaco was the Regional Sales Manager for the Southeastern region of the United States, managing a staff of sales employees in CIS' Atlanta office. His responsibilities included the selling and leasing of computer equipment, and his salary was a base salary of $60,000 per year plus commissions.

3. Monaco's entitlement to commissions was governed by various incentive compensation agreements. CIS approved a new compensation plan for Regional Sales Representatives in February 1990 (the "February Plan"). In June of 1990, the February Plan was replaced with another incentive compensation plan (the "June Plan"). The parties have stipulated that each plan, in its turn, was a valid, enforceable written contract.

4. Both compensation plans provided for payment of commissions to an employee in the event that the employee's termination was not-for-cause.

5. The February Plan stated: "In the event that an employee is terminated, but not for cause, termination benefits will include compensation for transactions where a transaction summary was completed with *all necessary approvals* prior to termination. Commissions for such transactions will be paid in accordance with provision 3 [Commission Payments] above." (emphasis added)

6. The language in the June Plan providing for payment of commissions in the event of a termination not-for-cause was nearly identical to that of the February Plan. How-

ever, the June Plan used the words "all prerequisite approvals" instead of "all necessary approvals".

7. Both parties agree that there was a form known as the "Transaction Summary Form" which was utilized by sales representatives to provide information in summary form about a proposed transaction and obtain approvals of it.

8. The Transaction Summary Forms which were in use at the time of the transactions at issue had two columns on their right hand side. One column was labeled "Approval", the other was labeled "Date". The Approval column provided several boxes, designated by job titles, in which the persons in those positions were to place their initials. The Date column provided space for the date beside each set of initials.

9. After the 1989 filing of these Chapter 11 cases, resignations and dismissals occurred in the Southeastern Region. As a result, Monaco assumed increasing direct responsibility for the accounts in his region, including an account with Bell South Services Incorporated, which acted as agent for South Central Bell Telephone Company (the "Bell South" account). The disputed commissions that Monaco seeks are with respect to transactions in the Bell South account (the "Bell South Transactions").

10. In March and October of 1990, CIS made commission payments totalling $25,272 to Monaco in connection with another transaction.

11. Thereafter, Monaco sought an additional commission payment of $63,664 on that other transaction. In June 1991, a commission check was issued to Monaco in the amount of $38,539.

12. On July 12, 1991, the Trustee notified Monaco by memo that there had been an overpayment of commissions to him which would be recovered from other commissions as they came due. The overpayment was subsequently recouped out of future commissions, with a deduction for imputed interest against Monaco for the prior overpayment. Some of the recoupment was made from commission payments due on Bell South transactions. Monaco did not agree that

there had been a prior overpayment and continued to request additional commissions.

13. Thereafter, by letter dated September 19, 1991, the Trustee terminated Monaco's employment.[2]

14. At the time of Monaco's termination, several Bell South transactions that Monaco had handled were not yet completed. The Bell South account was subsequently reassigned to another sales representative who completed the transactions. The finalized transactions were premised on negotiations on new proposals with new transaction numbers.

15. On November 2, 1993, Monaco filed this adversary proceeding seeking commissions totalling $68,392 for various transactions, including, in Count Two, several with Bell South. Monaco also claimed in Count Three that he was entitled under the New York Labor Law to liquidated damages and attorneys' fees over and above his claims for compensation. He further sought interest and costs.

16. After the Trustee moved for Partial Summary Judgment and Monaco cross-moved for Partial Summary Judgment, the parties filed a Joint Submission Pursuant to Local Bankruptcy Rule 7056-1 (the "Joint Submission") in which the parties presented a stipulation of facts.[3] The Joint Submission resolved all but two of the forty-seven transactions identified in Count Two of Monaco's complaint.

17. The parties agreed that the only transactions which remained in dispute were two Bell South Transactions, totalling $3890 in commissions. These were Transaction No. 115328/Bell South in the amount of $2742 and Transaction No. 115358/Bell South in the amount of $1148.

18. The Transaction Summary Form for Transaction No. 115328/Bell South had five signed boxes in the Approval column at the time of Monaco's departure and six unsigned boxes. The Transaction Summary Form for Transaction No. 115328/Bell South had seven signed boxes in the Approval column and six unsigned boxes.[4]

19. The parties further stipulated that Monaco had been employed by CIS, and was owed $6160 in unpaid commissions for the balance of the transactions listed in Count Two. The figure of $6160 was derived by subtracting from Monaco's initial request for $40,267 the still disputed amount of $3890, as well as the $30,217 to which the parties agreed that Monaco was not entitled. The parties further agreed that Monaco was owed $3000 for unused vacation.

20. The court held a hearing on these motions on May 30, 1996 and ruled against Monaco as to Counts One, Four and Five. The court took the balance of Counts Two and Three under advisement, requesting supplemental affidavits from the parties.

21. The supplemental affidavits invited by the court were to set forth whether Monaco had in fact obtained the necessary or prerequisite approvals for the Bell South Transactions prior to his termination. The court also stated that it would accept supplementary submissions concerning whether it was customary for CIS to account for the time value of money when recovering an overpayment from future commissions.

22. Both parties submitted additional affidavits. Monaco's supplemental papers included a chronology of Monaco's involvement with the Bell South transactions as well as a request for pre-judgment interest on the conceded commissions and vacation pay. Monaco's supplemental papers further stated that the arrangement Monaco had with his coun-

---

2. See Exhibit B of Monaco's Complaint. The Trustee has agreed that for the purposes of determining the summary judgment motions Monaco's termination should be treated as one not-for-cause.

3. See CIS v. Citicorp North America, 188 B.R. 873 (S.D.N.Y.1995) for a discussion of the use of a joint statement to facilitate identification of the material facts actually in dispute.

4. The Transaction Summary Forms varied slightly depending on the sort of transaction that was involved. Thus, the form for Transaction No. 115328/Bell South, which was for a lease extension, provided eleven spaces for signature, while the form for Transaction No. 115358/Bell South provided space for thirteen.

sel was that counsel was to receive twenty-five percent of any amount recovered on Monaco's behalf. Monaco did not make any submission regarding whether the interest calculated in applying the earlier overpayment to later commissions was customary. Since Monaco has not made an additional submission regarding that issue, the court concludes that the Trustee accounted for the time value of money in the customary manner.

23. The Trustee's supplemental papers asked that Monaco's papers be struck as nonresponsive. The Trustee also argued that summary judgment on Monaco's request for interest should be denied on the grounds that there were material facts in dispute concerning the starting date from which to calculate interest.

## DISCUSSION

### Standards for Summary Judgment

Federal Rule of Civil Procedure 56 ("Rule 56"), the summary judgment rule, is made applicable to adversary proceedings by Bankruptcy Rule 7056. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

On a motion for summary judgment, the court cannot resolve disputed issues of fact. If the court finds a genuine dispute exists as to the material facts, the court must deny the motion. Summary judgment is appropriate only to resolve disputed questions of law, or the application of the law to the undisputed facts.

A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), cert. denied, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *In re Tikijian,* 76 B.R. 304, 313 (Bankr.S.D.N.Y.1987). The court's function when faced with a motion for summary judgment is to determine whether there exist any genuine issues of material fact to be tried, and not to resolve any factual disputes. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. at 2510–11; *Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 9 (2d Cir.1983); *In re Ross,* 64 B.R. 829, 836 (Bankr.S.D.N.Y.1986). For the reasons more fully set forth below, this court finds that none of the material facts are disputed and all remaining issues in this adversary proceeding can appropriately be disposed by way of summary judgment.

### The Claim for Commissions for the Bell South Transactions

The dispute with respect to the Bell South Transactions turns on what the term "all prerequisite approvals" means.[5] Monaco argues because he had several signatures on the Transaction Summary Forms, these signatures were enough to signify approval of the Bell South Transactions. As further proof that he had approval to proceed with the transactions, Monaco cites the continuing nature of the negotiations up until the time of his termination. Monaco urges that something less than the completion of the full approval process was sufficient.

The Trustee's position is that the plans required *all* approvals to have been obtained prior to Monaco's termination. Since they had not been obtained, the Trustee urges that Monaco is not entitled to commissions on the two Bell South Transactions.

5. The parties agree that one or the other of the two compensation plans governed Monaco's various commission claims at the time of Monaco's termination. In the court's view, since the Bell South Transactions were not completed upon Monaco's termination in September 1991, it was the June Plan which controlled. However, no difference would result if the February Plan was applied. Nothing has been submitted that indicates that a meaningful difference was intended by the change from "all necessary approvals" to "all prerequisite approvals" in the June Plan.

■ It is axiomatic that a document is to be interpreted so as to give effect to the intent of the parties as expressed in the unequivocal language employed. *Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 485 N.E.2d 974, 495 N.Y.S.2d 309 (1985), *rearg. denied,* 67 N.Y.2d 647, 499 N.Y.S.2d 1031, 490 N.E.2d 558 (1986); *Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978), *rearg. denied,* 46 N.Y.2d 940, 415 N.Y.S.2d 1027, 388 N.E.2d 372 (1979). *Alexander & Alexander Services, Inc v. These Certain Underwriters at Lloyd's, London, England,* 1996 WL 609441 (S.D.N.Y.) (the purpose of contract interpretation is to give effect to the expressed intention of the parties).

■ It is well settled in New York that the threshold decision on whether a writing is ambiguous is the exclusive province of the court. *Sutton v. East River Savings Bank,* 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075, 1077 (1982); *Patterson, Interpretation and Construction of Contracts,* 674 Colum.L.Rev. 833, 839 (1964). *Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's, London, England,* 1996 WL 609441 (S.D.N.Y.) (initial interpretation of a contract is a matter of law for the court to decide). Whether or not a document is ambiguous must be determined by the court as a matter of law on the face of the document by giving the words of the contract their ordinary and reasonable meaning. *Keene Corporation v. Bogan,* 1990 WL 1864, 1866 (S.D.N.Y.). *See also Dawson Home Fashions, Inc. v. SRCO Inc.,* 1995 WL 679253 (S.D.N.Y.) (the cardinal rule of contract interpretation is to give effect to the plain and ordinary meaning of language). *See also Tucker Leasing Capital Corp. v. Marin Medical Management, Inc.,* 833 F.Supp. 948, 955 (E.D.N.Y.1993) (words and phrases should be given their plain meaning). *See also General Star Indemnity Company v. Custom Editions Upholstery Corp.,* 940 F.Supp. 645, 654 (S.D.N.Y.1996) (unambigu-ous terms of insurance policy given their plain and ordinary meaning).

■ A contract term is ambiguous when it is susceptible to at least two reasonable meanings. *Keene Corporation v. Bogan,* 1990 WL 1864, 1866 (S.D.N.Y.). *General Star Indemnity Company v. Custom Editions Upholstery Corp.,* 940 F.Supp. 645, 654 (S.D.N.Y.1996). *See also Tucker Leasing Capital Corp. v. Marin Medical Management, Inc.,* 833 F.Supp. 948, 955 (E.D.N.Y. 1993) (a term is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of an entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business). On the other hand, contract language is unambiguous when it has a definite and precise meaning, unattended by the danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion. *Dawson Home Fashions, Inc. v. SRCO Inc.,* 1995 WL 679253 (S.D.N.Y.) *See also, Keene Corporation v. Bogan,* 1990 WL 1864, 1866 (S.D.N.Y.). If the language used is ambiguous, then summary judgment is inappropriate. *Dawson Home Fashions, Inc. v. SRCO Inc.,* 1995 WL 679253 (S.D.N.Y.) However, "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations." *Seiden Associates, Inc.,* 959 F.2d 425, 428 (2nd Cir.1992). *Keene Corporation v. Bogan,* 1990 WL 1864, *6 (S.D.N.Y.).

■ In the present case, the court holds that the pertinent contract language is unambiguous. The plan required that an employee obtain *all* prerequisite approvals prior to the employee's termination in order to be entitled to commissions. All is not a term of ambiguity. It means every one, not merely some or a majority. Thus, the plan marks the obtaining of all approvals as the point at which commissions are due to a terminated without-cause employee. In the absence of all approvals, commissions are not due.[6]

---

6. The court notes that any number of events could have been selected as the point at which an employee would be entitled to commissions in the event of a without-cause termination. Throughout the incentive compensation plan, provisions were made for commissions to be paid

█ ▌9] The way in which approvals were normally documented was by signatures on a transaction summary form. The Transaction Summary Forms relating to the two Bell South Transactions in dispute each had several signature boxes which were not initialed. The absence of these initials on the relevant forms evidences that all prerequisite approvals had not been obtained. The additional work done by a subsequent salesperson on the Bell South Transactions is a further indication that all approvals had not been obtained prior to Monaco's termination. Monaco has made no assertion that any nonsignatory had actually given approval but failed to sign the Transaction Summary Forms prior to his termination. Finally, Monaco's argument that the approval process changed frequently is insufficient to overcome the express language in the compensation plan that governed at the time of Monaco's termination. Monaco has failed to demonstrate that all meant something other than all. Therefore, the court finds that since Monaco did not have all approvals, he is not entitled to receive commissions for the Bell South Transactions.

### The Claim Under New York Labor Law § 190 et. seq.

Monaco alleges in Count Three of his complaint that the Trustee's failure to pay commissions and accrued vacation pay constituted a willful failure to pay wages in violation of the New York State Labor Law.[7] He argues that as a result he is entitled, in addition to the statutory remedies of attorneys' fees and costs, to the liquidated damages provided for by the Labor Law when a failure to pay is found to have been willful.

The Trustee contends the failure to pay the commissions and vacation pay should not be considered "willful" within the meaning of the statute because of the significant disagreement between the Trustee and Monaco

over the amount of commissions Monaco was due. The Trustee has also argued that some or all of the commissions Monaco sought should be considered to be "incentive compensation" within the meaning of § 191(1-c) of the New York State Labor Law. The court rejects both of these arguments for the reasons articulated below.

The New York Labor Law is a fee-shifting statute, the overall intent of which is to protect employees from having their rightful wages kept from them. All employees who prevail are entitled to reasonable attorneys' fees. In addition and consistent with the statute's overall intent, an employee is also entitled to liquidated damages when the failure of an employer to pay is determined to be willful. New York Labor Law § 198(1-a) reads in pertinent part as follows:

> "In any action instituted upon a wage claim by an employee * * * in which the employee prevails, the court *shall* allow such employee reasonable attorney's fees and, upon a finding that the employer's failure to pay the wage required by this article was willful, an additional amount as liquidated damages equal to twenty-five percent of the total amount of wages found to be due." (emphasis added)

*See generally, Gottlieb v. Kenneth Laub & Company,* 82 N.Y.2d 457, 605 N.Y.S.2d 213, 626 N.E.2d 29 (1993), *cited in Tischmann v. ITT/Sheraton Corporation,* 882 F.Supp. 1358 (S.D.N.Y.1995). *See also Canet v. Gooch Ware Travelstead,* 917 F.Supp. 969 (E.D.N.Y.1996).

Turning to the Trustee's characterization of Monaco's commission claims as incentive compensation, the court finds the issue one that is principally of academic interest. As the court reads the New York Labor Law § 191(1-c), commissions which fall within the definition of incentive compensation may be paid less frequently than monthly, though

upon the occurrence of different events, depending on the type of transaction. For example, commissions for future transactions were paid upon installation of the equipment. Commissions for leases and sales, as well as for subleases, were earned upon execution of documentation covering the acquisition and disposition of equipment.

7. The term "wages" is defined in § 190(1) of the New York State Labor Law. Commissions as well as benefits and wage supplements are included within this definition. Section 198–c(2) further defines the phrase "benefits and wage supplements" to include vacation pay. It is undisputed by the parties that the vacation pay Monaco seeks is within the definition of wages.

never later than the time set forth in the governing agreement.

The courts have held that what falls into the category of incentive compensation are not always those payments which employers call incentive compensation. Rather, the delineation of what is incentive compensation has been based on factors falling outside the scope of an employee's work. *Samuels v. Thomas Crimmins Contracting Co.*, 1993 WL 36168 (S.D.N.Y.1993). Some examples of these factors are payments that are not based on individual performance, *Samuels v. Thomas Crimmins Contracting Co.*, 1993 WL 36168 (S.D.N.Y.1993), bonuses that are tied to the overall output rate of the department, *Dean Witter Reynolds v. Ross*, 75 A.D.2d 373, 429 N.Y.S.2d 653 (1st Dep't. 1980), and whether the amount of the bonus, or whether to pay it at all, is within the discretion of the employer, *Canet v. Gooch Ware Travelstead*, 917 F.Supp. 969 (E.D.N.Y.1996). *See also Bentley v. ASM Communications, Inc.*, 1991 WL 105220 (S.D.N.Y.) (promise of stock was incentive compensation when it was promised as incentive to sign with employer and not in return for work of any specified duration), and *Magness v. Human Resource Services, Inc.*, 161 A.D.2d 418, 555 N.Y.S.2d 347 (1st Dep't.1990) (employee entitled to recover attorney's fees and liquidated damages for breach of settlement agreement based on wage claim, but not liquidated damages for unpaid "supplemental income").

Conversely, a nondiscretionary bonus plan created by the employer has been held to be wages, not incentive compensation. *Westheim v. Elkay Indus.*, 166 A.D.2d 318, 560 N.Y.S.2d 779 (1st Dep't.1990), *cited in Tischmann v. ITT/Sheraton Corp.*, 882 F.Supp. 1358 (S.D.N.Y.1995). An employer was found to be required to pay an incentive bonus not later than the last date of the month following the month in which it was earned when no date was specified in the

governing contract. *See Watson v. Prentice–Hall, Inc.*, 50 A.D.2d 1077, 376 N.Y.S.2d 339 (4th Dep't.1975). In *Bentley v. ASM Communications, Inc.*, 1991 WL 105220 (S.D.N.Y.), the disputed bonus was held to be wages and not incentive compensation when the employer agreed that the employee was entitled to three-quarters of the promised bonus because the employee had worked three-quarters of that year. Similarly in *Giuntoli v. Garvin Guybutler Corp.*, 726 F.Supp. 494 (S.D.N.Y.1989), the court held that past due bonuses which were already due and vested fell within the definition of wages, while unearned future payments were not wages. The court did hold, however, that incentive bonuses do not become wages until after all discretionary adjustments have been made. *See also Dean Witter Reynolds v. Ross*, 75 A.D.2d 373, 429 N.Y.S.2d 653 (1st Dep't.1980), and *Evans v. Ocwen Financial Corp.*, 1993 WL 319181 (S.D.N.Y.1993).

■■■] The Trustee has conceded that Monaco is entitled to $6160 in unpaid commissions in addition to $3000 in unused vacation pay. These payments were due at the time of Monaco's termination. This was true whether or not the commissions were incentive compensation. Thus, this court must find that the $6160 in commissions and $3000 of unused vacation pay are "wages" within the definition of New York Labor Law § 198(1–a). *See Giuntoli v. Garvin Guybutler Corporation*, 726 F.Supp. 494 (S.D.N.Y. 1989).

■■■] Since Monaco has "prevailed" on his wage claim for the conceded commissions and vacation pay, he is entitled by statute to receive attorneys' fees with respect to these claims, without regard to whether the failure to pay was willful.[8] The court sees no reason to disturb the fee arrangement agreed upon between Monaco and his counsel as set forth in their supplementary affidavit. The stated rate of counsel's representation is twenty-five percent of any amount recovered on Mona-

---

8. Since the court has ruled that Monaco is not entitled to commission payments for the two disputed Bell South Transactions or the commissions sought in Count One of his complaint, he is not entitled to receive attorneys' fees and liquidated damages as to these amounts. *See Allen v. The Katz Agency, Inc. Employee Stock Ownership Plan*, 677 F.2d 193 (2nd Cir.1982), *Allison v. Fundamental Brokers, Inc.*, 1991 WL 51081 (S.D.N.Y.1991), and *Berardi v. Fundamental Brokers, Inc.*, 1992 WL 27169 (S.D.N.Y.1992) (plaintiffs were not entitled to attorneys' fees and liquidated damages because they were not entitled to the pay in question).

co's behalf. In this case, that would be twenty-five percent of $9160, or $2290.

As indicated earlier, Monaco also seeks liquidated damages equal to twenty-five percent of the amounts found to be due him on the grounds that the failure to pay was "willful." The Trustee urges the failure to pay the commissions and vacation pay was not "willful" within the meaning of New York Labor Law § 198(1–a) because a bona fide dispute existed over the total amount due to Monaco.

It has been held that a bona fide dispute can preclude a finding of willful failure to pay. *See Bigda v. Fischbach Corporation,* 849 F.Supp. 895 (S.D.N.Y.1994) (presence of bona fide dispute over plaintiff's entitlement to disputed wages precluded recovery of additional damages under § 198(1–a)). *See also Berardi v. Fundamental Brokers, Inc.,* 1992 WL 27169 (S.D.N.Y.1992) (examination of analogous provisions in other states leads to conclusion that bona fide dispute precludes finding of willfulness). The issue in this case in regard to willfulness is whether an employer who disputes some, but not all, of an employee's wage claim must pay the undisputed portion in order to avoid liability for liquidated damages.

■■■■■■] The courts have treated the term "willful" for the purposes of New York Labor Law § 198(1–a) as an issue of fact. *Maggione v. Bero Construction Corporation,* 106 Misc.2d 384, 431 N.Y.S.2d 943 (Supreme Court, Seneca County 1980) (court denied summary judgment of the plaintiff's claims for attorneys fees' for failure to pay his bonus because the question whether withholding of wages was willful and the question in regard to the amount of attorneys' fees to be awarded were ones of fact). *See also Magness v. Human Resource Services, Inc.,* 161 A.D.2d 418, 555 N.Y.S.2d 347 (1st Dep't.

1990) (court found willfulness in employer's breach of settlement agreement of wage claim; no reason was offered for employer's failure to live up to the settlement agreement). It has also been held to be relevant whether the terms of the employment agreement drafted by the employer are clear, unequivocal and complete. *Cohen v. Fox–Knapp, Inc.,* 226 A.D.2d 207, 640 N.Y.S.2d 554 (1st Dep't.1996). *See also Daley v. The Related Companies, Inc.,* 179 A.D.2d 55, 581 N.Y.S.2d 758 (1st Dep't.1992) (dissent argued against finding willfulness where agreement cried out for interpretation). Willfulness requires the intentional doing of an act and knowing that the act is being done. It requires a capacity to act and may be negated by inadvertence or inability. It need not carry any implication of malice or bad faith.[9] No case has been cited to the court in which there was a bona fide dispute as to only some of the wages due the employee.

■■■■] By not requiring a showing of bad purpose, the New York Labor Law treats as neutral a remedy which in another context might be intended as punitive. In this context liquidated damages are compensatory rather than punitive. They are intended to compensate for any losses which a worker might suffer because of the wrongful retention of his pay.[10] Moreover, to require a showing of actual malice or improper motive could preclude many employees from obtaining relief under the statute because an employer could easily explain a failure to pay without evidencing malice. By lowering the standard that an employee must meet in order to gain not only recovery of attorneys' fees, but also liquidated damages, the statute better affords the blanket of protection it was designed to provide. This court concludes that an employer must pay the employee the undisputed portion of wages claimed in order to avoid a finding that fail-

---

**9.** *Also see generally* Black's Law Dictionary 1599 (6th ed.1990) ("willful" defined as "proceeding from a conscious motion of the will; voluntary; knowingly; deliberate; intending the result which actually comes to pass; designed; intentional; purposeful; not accidental or involuntary.")

**10.** For similar treatment of liquidated damages under another labor statute, *see Soler v. G & U,*

*Inc.,* 628 F.Supp. 720 (S.D.N.Y.1986) (since employer knowingly, and thus willfully, made wage deductions from migrant farm workers, the court awarded liquidated damages under the Fair Labor Standards Act, 29 U.S.C. § 216(b), stating that liquidated damages were compensation for the lost use of the wages, rather than a penalty or punishment).

ure to pay was willful. This would best promote the policy of the statute by discouraging employers from placing leverage on employees with respect to the disputed portion by withholding the undisputed portion.

The Trustee has failed to refute Monaco's contention that the failure to pay the undisputed claims was knowing and intentional. No issue has been raised concerning an inability to pay. Monaco is therefore entitled to liquidated damages of twenty-five percent of the amount of wages due. Thus, the liquidated damages to which Monaco is entitled are twenty-five percent of $9160, or $2290.

### Interest and Costs

Monaco has also sought both pre and post-judgment interest. Post-judgment interest is mandated by 28 U.S.C. § 1961, and is calculated from the date the judgment is entered. Pre-judgment interest may be granted under Federal Rule of Civil Procedure 54(c), made applicable by Bankruptcy Rule 7054(a), when a court finds that the prevailing party is entitled to this relief, and this relief is appropriate and does not prejudice the opposing party.[11]

In the present case, Monaco has been granted liquidated damages. Since liquidated damages are in the nature of compensation for the lost use of wages, they are the functional equivalent of pre-judgment interest.[12] To award Monaco both pre-judgment interest and liquidated damages would provide Monaco redress twice for the same loss. Moreover, the Debtors' estate has had to bear the burden of the expense of litigating with Monaco over his commission and

claims which exceeded $68,000 (or $968,000 including the dollar amount set forth in Monaco's complaint), although the court has ruled against Monaco on almost all of them. Thus, pre-judgment interest is inappropriate.[13]

In regard to costs, New York Labor Law § 198(1) states that a court may allow a prevailing employee "in addition to ordinary costs, a reasonable sum, not exceeding fifty dollars for expenses which may be taxed as costs." This court finds that Monaco is entitled to ordinary costs.

### CONCLUSION

The Trustee's motion for partial summary judgment on the issue of Monaco's entitlement to commission payments for the two Bell South Transactions is granted. Monaco's cross-motion for partial summary judgment on this issue is denied.

Monaco's cross-motion for partial summary judgment is granted as to attorneys' fees and liquidated damages on the conceded commissions and accrued vacation time. Monaco is entitled to be paid $6160 for the commissions, $3000 for accrued vacation time, $2290 in attorneys' fees, and $2290 in liquidated damages, with parties to calculate interest and costs on the total of $13,740 in a manner consistent with this decision.

Settle appropriate judgment.

11. *See generally,* 6 James WM. Moore et al., Moore's Federal Practice § 25.03[8] (2d ed.1987) and 10, Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §§ 2662, 2664 (2d ed.1983 and 2d ed. Supp. 1996). *See also Newburger, Loeb & Co., Inc., v. Gross,* 611 F.2d 423 (C.A.2d 1979) and *Roth v. Fabrikant Bros., Inc.,* 175 F.2d 665 (C.A.2d 1949), *annotated therein,* and *In re Harvard Knitwear, Inc. v. Private Brands, Inc., et al.,* 193 B.R. 389 (E.D.N.Y.1996) (pre-judgment interest granted from date trustee filed avoidance action, as equitable remedy for wrongful retention of funds during pendency of lawsuit).

12. *See analogously, O'Hare v. General Marine Transport Corp.,* 740 F.2d 160 (C.A.2d 1984) (court compared granting of pre-judgment interest to liquidated damages obtainable under ERISA, 29 U.S.C. § 1132(g)(2)).

13. The Trustee had argued that the proper date from when to calculate interest is in dispute since the date from which commissions were owed varied with the type of transaction. Because the court has determined that pre-judgment interest is unwarranted so long as liquidated damages are granted, there fortunately prove to be no material facts in dispute concerning this issue.